STEPHANIE S. CHRISTENSEN
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SHAWN J. NELSON (Cal. Bar No. 185149)
GREGORY BERNSTEIN (Cal. Bar No. 299204)
KEITH D. ELLISON (Cal. Bar No. 307070)
GREGG E. MARMARO (Cal. Bar No. 338627)
Assistant United States Attorneys
      1200 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: 213-894-5339/3183/6920/8500
      Facsimile: 213-894-0142
      E-mail: shawn.nelson@usdoj.gov
              gregory.bernstein@usdoj.gov
              keith.ellison2@usdoj.gov
              gregg.marmaro@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:18-CR-00173(A)-GW-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM |
| v. | Trial Date:  August 2, 2022 |
| | Trial Time:  8:30 a.m. |
| JOSE LANDA-RODRIGUEZ, et al., | Location:    Courtroom of the |
| [#2-GABRIEL ZENDEJAS-CHAVEZ] | Honorable George H. |
| | Wu |
| Defendants. | |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Shawn J. Nelson,
Gregory Bernstein, Keith D. Ellison, and Gregg E. Marmaro, hereby
files its Trial Memorandum.

1    This Trial Memorandum is based upon the attached memorandum of

2  points and authorities, the files and records in this case, and such

3  further evidence and argument as the Court may permit.

4  Dated: July 27, 2022,              Respectfully submitted,

5                                     STEPHANIE S. CHRISTENSEN
                                      Acting United States Attorney
6
                                      SCOTT M. GARRINGER
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                     _____/s/_____
                                      SHAWN J. NELSON
10                                    GREGORY BERNSTEIN
                                      KEITH D. ELLISON
11                                    GREGG E. MARMARO
                                      Assistant United States Attorneys
12
                                      Attorneys for Plaintiff
13                                    UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                            PAGE

TABLE OF AUTHORITIES..............................................i

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.   STATUS OF THE CASE...........................................1

     A.   Procedural Background...................................1

     B.   Trial Matters..........................................1

          1.   Trial Estimate....................................1

          2.   Expert Notice.....................................2

          3.   Stipulations......................................2

          4.   Witness/Jenks Statements..........................3

          5.   Trial Filings.....................................3

          6.   Motions in Limine.................................4

          7.   Presentation of Evidence..........................5

          8.   Defenses..........................................5

II.  ELEMENTS OF THE CHARGED OFFENSES.............................5

III. EVIDENTIARY AND LEGAL ISSUES.................................5

     A.   Recorded Statements....................................5

          1.   Authentication and Identification.................6

          2.   Transcripts of Recorded Statements................8

     B.   Case Agent's Lay Testimony Will Aid the Jury's
          Understanding of the Certain Evidence..................9

     C.   Relevant Conspiracy Law...............................12

          1.   General Principles...............................12

          2.   Racketeering Conspiracy..........................14

     D.   Co-Conspirator Statements.............................15

     E.   Other Hearsay Exceptions..............................18

          1.   Past Recollection Recorded.......................18

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                      PAGE

       2.   Present Sense Impression............................19

       3.   Defendants' Hearsay Statements......................19

  F.  Business Records.........................................19

  G.  Charts and Summaries....................................20

  H.  Photographs.............................................22

  I.  Physical Evidence......................................23

  J.  Electronic Records.....................................25

  K.  Prison and Jail Records of Inmates.....................25

  L.  Use of Exhibits During Opening Statement...............26

  M.  Cross-Examination of Defendant.........................26

  N.  Character Evidence.....................................27

  O.  Jury Nullification and Other Improper Defenses.........28

  P.  Jury Questions.........................................28

IV.  THE CASE AGAINST DEFENDANT....................................30

  A.  Defendant GABRIEL ZENDEJAS-CHAVEZ Hosts an Eme Meeting at his Law Office.......................................31

  B.  Defendant GABRIEL ZENDEJAS-CHAVEZ Uses His Status as an Attorney to Meet With and Pass Messages to Mexican Mafia Members in Pelican Bay State Prison...............31

  C.  Defendant GABRIEL ZENDEJAS-CHAVEZ and UICC-38 Discuss Collecting and Laundering Mexican Mafia LACJ Enterprise Proceeds......................................32

  D.  Defendant GABRIEL ZENDEJAS-CHAVEZ Facilitates the Extortion of the Mongols Outlaw Motorcycle Gang and the Intimidation of a Victim of a Jail Stabbing..........33

  E.  Smuggling of Heroin and Methamphetamine into LACJ.......34

  F.  Defendant GABRIEL ZENDEJAS-CHAVEZ Uses His Status as an Attorney to Pass Mexican Mafia Orders Regarding Assaults, Murder, and Drug Trafficking...................34

  G.  Between May 5, 2014, and May 11, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ travelled to Mexico. Defendant

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                    PAGE

          GABRIEL ZENDEJAS-CHAVEZ Used his Status to Pass
          Mexican Mafia Messages to JOSE LANDA-RODRIGUEZ...........35

    H.    Defendant GABRIEL ZENDEJAS-CHAVEZ Uses His Status as
          an Attorney to Discuss Mexican Mafia Business...........36

    I.    Defendant GABRIEL ZENDEJAS-CHAVEZ Informs Others that
          Luis Garcia had Dropped Out of the Mexican Mafia........36

    J.    Directions to Send Mexican Mafia LACJ Enterprise
          Business and Proceeds Through Defendant GABRIEL
          ZENDEJAS-CHAVEZ.........................................37

    K.    Conspiracy to Remove Mexican Mafia Member A.E. From
          Power and to Take Over His Territories..................37

    L.    Defendant GABRIEL ZENDEJAS-CHAVEZ Used His Status as
          an Attorney to Pass Messages About Mexican Mafia
          Business................................................39

    M.    Smuggling of Heroin and Mexican Mafia LACJ Enterprise
          Correspondence into LACJ................................40

    N.    Attorney GABRIEL ZENDEJAS-CHAVEZ Passes Mexican Mafia
          Messages................................................40

    O.    Defendant RAFAEL LEMUS Assists DMM-2 in Running
          Mexican Mafia LACJ Enterprise Business, Including Drug
          Trafficking and Extortion...............................40

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                      <u>PAGE</u>

3

**Cases**

4

<u>Blumenthal v. United States</u>,
   332 U.S. 539 (1947)  ........................................ 13

5

<u>Bourjaily v. United States</u>,
   483 U.S. 171 (1987)  ........................................ 15

6

7

<u>Crawford v. Washington</u>
   541 U.S. 36 (2004)  ......................................... 15

8

<u>Gallego v. United States</u>,
   276 F.2d 914 (9th Cir. 1960) ................................ 24

9

10

<u>Garlington v. O'Leary</u>,
   879 F.2d 277 (7th Cir. 1989)  .......................... 17, 18

11

<u>Lucero v. Stewart</u>,
   892 F.2d 52 (9th Cir. 1989) ................................. 22

12

13

<u>Michelson v. United States</u>,
   335 U.S. 469 (1948)  ........................................ 27

14

<u>People of Territory of Guam v. Ojeda</u>,
   758 F.2d 403 (9th Cir. 1985) ................................ 23

15

16

<u>Salinas v. United States</u>,
   522 U.S. 52 (1997)  ......................................... 14

17

<u>Smith v. United States</u>,
   133 S. Ct. 714 (2013)  ................................. 13, 14

18

19

<u>United States v. Abushi</u>,
   682 F.2d 1289 (9th Cir. 1982)  .............................. 13

20

<u>United States v. Albertelli</u>,
   687 F.3d 439 (1st Cir. 2012)  ............................... 10

21

22

<u>United States v. Ammar</u>,
   714 F.2d 238 (3d Cir. 1983)  ................................ 17

23

<u>United States v. Andersson</u>,
   813 F.2d 1450 (9th Cir. 1987)  .............................. 12

24

25

<u>United States v. Anekwu</u>,
   695 F.3d 967 (9th Cir. 2012)  ............................... 20

26

<u>United States v. Arambula-Ruiz</u>,
   987 F.2d 599 (9th Cir. 1993)  ............................... 16

27

28

i

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Arias-Villanueva,
    998 F.2d 1491 (9th Cir. 1993) ................................. 17

United States v. Barnes,
    604 F.2d 121 (2d Cir. 1979) ................................. 18

United States v. Beltran-Rios,
    878 F.2d 1208 (9th Cir. 1989) ................................. 12

United States v. Black,
    767 F.2d 1334 (9th Cir. 1985) ................................. 24

United States v. Boulware,
    470 F.3d 931 (9th Cir. 2006) ............................... 20-21

United States v. Chu Kong Yin,
    935 F.2d 990 (9th Cir. 1991) (per curiam) ................. 23, 24

United States v. Cloud,
    872 F.2d 846 (9th Cir. 1989) ................................. 12

United States v. Collom,
    614 F.2d 624 (9th Cir. 1979) ................................. 29

United States v. Crespo de Llano,
    838 F.2d 1006 (9th Cir. 1987) ................................. 15

United States v. De Peri,
    778 F.2d 963 (3d Cir. 1985) ................................. 10

United States v. De Peri,
    77826 F.2d 963 (3d Cir. 1985) ................................. 26

United States v. DiNome,
    954 F.2d 839 (2d Cir. 1992) ................................. 14

United States v. Echeverry,
    759 F.2d 1451 (9th Cir. 1985) ............................. 17, 18

United States v. El-Mezain,
    664 F.3d 467 (5th Cir. 2011) ................................. 10

United States v. Espinosa,
    827 F.2d 604 (9th Cir. 1987) ................................. 12

United States v. Fernandez,
    839 F.2d 639 (9th Cir. 1988) ................................. 19

United States v. Francis,
    916 F.2d 464 (8th Cir. 1990) ................................. 14

1

**TABLE OF AUTHORITIES (CONTINUED)**

2   <u>DESCRIPTION</u>                                                    <u>PAGE</u>

3   <u>United States v. Freeman</u>,
     498 F.3d 893 (9th Cir. 2007) ................................. 11
4

<u>United States v. Frega</u>,
5    179 F.3d 793 (9th Cir. 1999) ................................. 29

6   <u>United States v. Fuentes-Montiji</u>,
     68 F.3d 352 (9th Cir. 1995) ............................... 8, 9
7

<u>United States v. Gadson</u>,
8    763 F.3d 1189 (9th Cir. 2014) ............................ 10, 11

9   <u>United States v. Garcia</u>,
     994 F.2d 1499 (10th Cir. 1993) .............................. 10
10

<u>United States v. Garza</u>,
11    980 F.2d 546 ................................................ 12

12   <u>United States v. Gil</u>,
     58 F.3d 1414 (9th Cir. 1995)(a) ............................. 15
13

<u>United States v. Harrington</u>,
14    923 F.2d 1371 (9th Cir. 1991) ............................... 24

15   <u>United States v. Hill</u>,
     42 F.3d 914 (5th Cir. 1995) ................................. 13
16

<u>United States v. Hubbard</u>,
17    96 F.3d 1223 (9th Cir. 1996) ................................ 13

18   <u>United States v. Hultgren</u>,
     713 F.2d 79 (5th Cir. 1983) ................................. 12
19

<u>United States v. Jayyousi</u>,
20    657 F.3d 1085 (11th Cir. 2011) ........................... 10, 11

21   <u>United States v. Jimenez Recio</u>,
     537 U.S. 270 (2003) ........................................ 13
22

<u>United States v. King</u>,
23    472 F.2d 1 (9th Cir. 1972) .................................. 24

24   <u>United States v. King</u>,
     587 F.2d 956 (9th Cir. 1978) ................................. 6
25

<u>United States v. Krasovich</u>,
26    819 F.2d 253 ................................................ 13

27   <u>United States v. Layton</u>,
     720 F.2d 548 (9th Cir. 1983) ................................ 17

28

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                  PAGE

United States v. Lechuga,
    888 F.2d 1472 (5th Cir. 1989) ................................. 18

United States v. Loya,
    807 F.2d 1483 (9th Cir. 1987) ................................. 16

United States v. Matta-Ballesteros,
    71 F.3d 754 (9th Cir. 1995) ................................... 6

United States v. May,
    622 F.2d 1000 (9th Cir. 1980) ................................. 22

United States v. McCall,
    592 F.2d 1066 (9th Cir. 1979) ................................. 29

United States v. McCollom,
    664 F.2d 56 (5th Cir. 1981) ................................... 28

United States v. McIver,
    186 F.3d 1119 (9th Cir. 1999) .............................. 29-30

United States v. Mendiola,
    707 F.3d 735 (7th Cir. 2013) .................................. 7

United States v. Miller,
    664 F.2d 94 (5th Cir. 1981) ................................... 18

United States v. Miranda-Uriarte,
    649 F.2d 1345 (9th Cir. 1981) ................................. 27

United States v. Nixon,
    418 U.S. 683 (1974) .......................................... 17

United States v. Oaxaca,
    569 F.2d 518 (9th Cir. 1978) ................................. 22

United States v. Orozco,
    590 F.2d 789 (9th Cir. 1979) ................................. 26

United States v. Ortega,
    203 F.3d 675 (9th Cir. 2000) ................................. 19

United States v. Ortiz,
    776 F.3d 1042 (9th Cir. 2015) ................................. 7

United States v. Pena-Espinoza,
    47 F.3d 356 (9th Cir. 1995) ................................... 9

United States v. Perez,
    116 F.3d 840 (9th Cir. 1997) ................................. 12

iv

1          **TABLE OF AUTHORITIES (CONTINUED)**

2     DESCRIPTION                                              PAGE

3     United States v. Powell,
         955 F.2d 1206 (9th Cir. 1992) ............................... 28
4
      United States v. Rizk,
5        660 F.3d 1125 (9th Cir. 2011) ............................... 20

6     United States v. Rollins,
         544 F.3d 820 (7th Cir. 2008) ............................... 10
7
      United States v. Rrapi,
8        175 F.3d 742 (9th Cir. 1999) ............................... 8

9     United States v. Rubino,
         43127 F.2d 284 (6th Cir. 1970) ............................... 26
10
      United States v. Safavian,
11       435 F. Supp. 2d 36 (D.D.C. 2006) ............................... 25

12    United States v. Salcido,
         506 F.3d 729 (9th Cir. 2007) ............................... 25
13
      United States v. Santiago,
14       837 F.2d 1545 (11th Cir. 1988) ............................... 18

15    United States v. Schmit,
         881 F.2d 608 (9th Cir. 1989) ............................... 16
16
      United States v. Spawr Optical Research, Inc.,
17       685 F.2d 1076 (9th Cir. 1982) ............................... 16

18    United States v. Stearns,
         550 F.2d 1167 (9th Cir. 1977) ............................... 22
19
      United States v. Taghipour,
20       964 F.2d 908 (9th Cir. 1992) ............................... 8

21    United States v. Thomas,
         586 F.2d 123 (9th Cir. 1978) ............................... 13
22
      United States v. Tille,
23       729 F.2d 615 (9th Cir. 1984) ............................... 17

24    United States v. Torres,
         908 F.2d 1417 (9th Cir. 1990) ............................... 6-7, 7
25
      United States v. Turner,
26       528 F.2d 143 (9th Cir.1975) ............................... 8

27    United States v. Waters,
         627 F.3d 345 (9th Cir. 2010) ............................... 19
28

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Watson,
    650 F.3d 1084-91 (8th Cir. 2011)  ............................  26

United States v. Weiland,
    420 F.3d 1062 (9th Cir. 2005)  ..............................  26

United States v. Williams,
    989 F.2d 1061 (9th Cir. 1993)  ..........................  16, 17

United States v. Winters,
    530 F. App'x 390 (5th Cir. 2013)  ...........................  23

United States v. Yarbrough,
    852 F.2d 1522 (9th Cir. 1988)  ..........................  16, 18

United States v. Yeley-Davis,
    632 F.3d 673 (10th Cir. 2011)  ..............................  21

United States v. Zavala-Serra,
    853 F.2d 1512 (9th Cir. 1988)  .......................  15, 16-17

Zal v. Steppe,
    968 F.2d 924 (9th Cir. 1992)  ...............................  28

**Statutes**

18 U.S.C. § 1962  ...............................................  1
21 U.S.C. § 841  ................................................  1
21 U.S.C. § 846  ................................................  1

**Other**

Fed. R. Crim. P. 16  ......................................  2, 3, 4
Fed. R. Evid. 104  .........................................  15-16
Fed. R. Evid. 401  .........................................  22, 28
Fed. R. Evid. 405  .............................................  27
Fed. R. Evid. 701  .............................................  10
Fed. R. Evid. 702  .............................................  10
Fed. R. Evid. 801  .......................................  4, 15, 16, 19
Fed. R. Evid. 803  .......................................  18, 19, 26
Fed. R. Evid. 810  .............................................  16
Fed. R. Evid. 901  .......................................  6, 7, 23, 24, 25
Fed. R. Evid. 902  .........................................  19, 20
Fed. R. Evid. 1002  ............................................  22
Fed. R. Evid. 1006  ............................................  20

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   STATUS OF THE CASE**

3

**A.   Procedural Background**

4

The original indictment charged defendant and sixty-nine other

5

defendants with racketeering- and drug-related crimes related to

6

their participation in the Mexican Mafia enterprise that controlled

7

the Los Angeles County jail system.  That indictment was unsealed,

8

and defendant was arrested on, May 23, 2018.  A First Superseding

9

Indictment returned on March 31, 2022, charged defendant and eighteen

10

other remaining defendants with essentially the same charges.[1]

11

Defendant is charged with conspiring to participate in the

12

activities of a racketeering enterprise in violation of 18 U.S.C.

13

§ 1962(d) (Count One), conspiracy to distribute controlled substances

14

in violation of 21 U.S.C. § 846 (Count Five), aiding and abetting the

15

distribution of at least five grams of methamphetamine in violation

16

of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii) (Count Seven), and aiding

17

and abetting the distribution of heroin in violation of 21 U.S.C.

18

§ 841(a)(1), (b)(1)(C).[2]  Defendant has pleaded not guilty and trial

19

is set for August 2, 2022.

20

**B.   Trial Matters**

21

1.   <u>Trial Estimate</u>

22

In the absence of stipulations, the government estimates that

23

the government's case-in-chief, including cross-examination will last

24

about three weeks.  As set forth in the government's witness list

25

26

[1] The superseding indictment made a factual correction related

27

to another defendant and "cleaned out" the defendants who have pled
guilty.

28

[2] The elements of these charges and the specific allegations in
the indictment are further discussed in Section II, below.

1   (docket no. 3623) the government currently plans to call about

2   twenty-five witnesses.  The government provided its draft witness and

3   exhibit lists to defendant on about July 21, 2022, and filed its

4   preliminary witness list (docket no. 3623) and exhibit list (docket

5   no. 3620) on July 24, 2022.

6       Defendant has not provided an estimate for any defense case but

7   has submitted a defense witness list (docket no. 3630) of about

8   twenty-five witnesses.

9           2.   Expert Notice

10      On September 17, 2019, the government provided notice of several

11  expert witnesses expected to testify in its case-in-chief, including

12  (1) FBI Special Agent Joseph Talamantez, (2) LASD Deputy Sheriff and

13  FBI Task Force Officer Devon Self, (3) DEA Forensic Chemist Trevor

14  Equitz, (4) DEA Forensic Chemist Annecia Martin, (5) LASD Forensic

15  Chemist Celeste Trujillo, and (6) LASD Forensic Chemist Aaron Lewis.

16      As further explained in the Government's Motion in limine No. 3

17  to Compel Supplemental Expert Disclosures or Exclude Testimony

18  (docket no. 3638) defendant has stated her intent to call at least

19  three expert witnesses but has not provided the notice required by

20  Federal Rule of criminal Procedure 16(b)(1)(C).

21          3.   Stipulations

22      On July 20, 2022, the Government proposed fifteen stipulations

23  that covered mundane, seemingly uncontested matters such as the

24  authentication of about sixteen recorded jail calls, a chart

25  summarizing the records of defendant's visits to various jails and

26  prisons, authentication of jail video recordings, the recovery of

27  "kites" and other evidence from within LACJ, the recovery and testing

28  of drugs seized from other defendants, photographs of "kites"

1  recovered from LACJ, photographs of drugs recovered from other

2  defendants, and the foundation for intercepted wire calls.  On July

3  23, 2022, defendant told the government he would not be entering into

4  any stipulations.  The government estimates that his will require

5  about twelve additional witnesses.  Defendant has not proposed any

6  stipulations.

7            4.   Witness/Jenks Statements

8        The government has been providing witness statements from around

9  the time of the takedown.  In anticipation of trial, the government

10  has disclosed what it believes to be the Jenks statements of its

11  witnesses, including grand jury transcripts.  The government is aware

12  of its ongoing duty to produce newly created Jenks material.

13        As more fully described in the Government's Motion in limine No.

14  3 to Compel Supplemental Expert Disclosures or Exclude Testimony

15  (docket no. 3638) defendant has stated her intent to call at least

16  three expert witnesses but has not provided the notice required by

17  Federal Rule of criminal Procedure 16(b)(1)(C).  Defendant has also

18  produced about nine reports of investigation of what appear to be

19  non-percipient character witnesses that are likely to be duplicative.

20            5.   Trial Filings

21        The government sent proposed jury instructions and verdict forms

22  to defendant on June 23, 2022.[3]  Defendant replied on July 24, 2022.

23  The government filed its proposed jury instructions (docket no. 3621)

24  and verdict form (docket no. 3622) on July 24, 2022.

25        The government proposed a joint statement of the case on July

26  23, 2022.  Following defendant's reply on July 24, 2022, the

27

28

---

[3] The government a single, minor modifications on July 24, 2022.

1    government (docket no. 3627) and defendant (docket no. 3631) filed

2    their own statements of the case.  As described above, the government

3    has filed a preliminary exhibit list and a preliminary witness list.

4    Defendant has filed a preliminary witness list.  The government will

5    provide final witness and exhibit lists to the Courtroom Deputy on

6    the morning of trial

7           6.   <u>Motions in Limine</u>

8         The government initially filed two motions in limine.[4]  The

9    first (docket no. 3624) seeks to keep the cross examination of the

10   Government's cooperating witnesses within the bounds of Rules 404,

11   608, and 609.  The second (docket no. 3625) seeks to exclude

12   Defendant's proffered duress defense.

13        Defendant filed three similar motions in limine, a motion "to

14   Preclude Specific Evidence" (docket no. 3628), a motion "to exclude

15   statements that do not meet the requirements of FRE 801(d)(2)(E)"

16   (docket no. 3632), and a motion "to Preclude use of Certain Kites"

17   (docket no. 3633).  The Government will file a single opposition to

18   these related motions.

19        Defendant also filed a motion "to Compel Brady and Henthorn

20   Information" (docket no. 3629).  The Government will be responding to

21   this motion, believes it has complied with its Brady and Henthorn

22   obligations, is aware of its ongoing Brady and Henthorn obligations,

23   and, if Defendant is aware of a specific piece of Brady or Henthorn

24   evidence that has not been produced, the Government requests

25

26

27

28        [4] As described in Section 2, above, following Defendant's
     inadequate Rule 16 expert disclosures, the Government has filed a
     third motion in limine to exclude the expert testimony.

1  Defendant explain what that is so that the Government can
2  investigate.

3         7.  <u>Presentation of Evidence</u>

4      The government intends to use the Trial Director software
5  program in order to display evidence via the in-Court monitors.  Such
6  evidence will include photographs, video, and audio recordings.  The
7  government has prepared transcripts for most of its audio exhibits.
8  The transcripts will be displayed on the monitors synced with the
9  playing audio.  The transcripts will also be authenticated by a
10  competent government witness.

11         8.  <u>Defenses</u>

12      Defendant has given notice of a duress defense and an entrapment
13  defense.  The Government has moved to preclude the duress defense as
14  defendant cannot establish a prima facie case.  Similarly, an
15  entrapment defense should be excluded because defendant cannot
16  establish a prima facie case.

17  **II.  ELEMENTS OF THE CHARGED OFFENSES**

18      The elements of the crimes are set forth in the Government's
19  Proposed Jury Instructions.

20  **III. EVIDENTIARY AND LEGAL ISSUES**

21      **A.  Recorded Statements**

22      At trial, the government will offer a variety of written and
23  recorded statements.  The recorded oral statements will include those
24  (i) made over the automated jail telephone recording system ("ITMS"),
25  (ii) intercepted by Title III wiretaps, and (iii) captured in a
26  consensually-recorded meeting between defendant and a cooperating
27  witness.  The government will also offer hundreds of written
28  statements, primarily in the form of (i) "kites" (which are notes

1    smuggled by prisoners), (ii) correspondence disguised as legal mail,
2    and (iii) notebooks containing ledgers and other notations.[5]

3              1.    Authentication and Identification

4         The government expects to introduce audio and video recordings.
5    Some of the recordings are lengthy, so the government has made clips
6    of the most pertinent parts.  Each recording has been produced to the
7    defense and has been placed onto compact discs, which the government
8    will offer as exhibits at trial.

9         The foundation that must be laid for the introduction into
10   evidence of recorded conversations is a matter largely within the
11   discretion of the trial court.  There is no rigid set of foundational
12   requirements.  Rather, the Ninth Circuit has held that recordings are
13   sufficiently authenticated under Federal Rule of Evidence 901(a) if
14   sufficient proof has been introduced "so that a reasonable juror
15   could find in favor of authenticity or identification," which can be
16   done by "proving a connection between the evidence and the party
17   against whom the evidence is admitted" and can be done by both direct
18   and circumstantial evidence.  United States v. Matta-Ballesteros, 71
19   F.3d 754, 768 (9th Cir. 1995), modified by 98 F.3d 1100 (9th Cir.
20   1996).

21        A recording is admissible upon a showing that it is "accurate,
22   authentic, and generally trustworthy."  United States v. King, 587
23   F.2d 956, 961 (9th Cir. 1978).  For example, testimony that a
24   recording depicts evidence that the witness observed or is familiar
25   with from personal observations is sufficient to authenticate the
26   recording.  Fed. R. Evid. 901(b); United States v. Torres, 908 F.2d

27   ─────────────────────

28        [5] The government will also introduce text messages as discussed
     below.

                                    6

1417, 1425 (9th Cir. 1990) ("Testimony of voice recognition
constitutes sufficient authentication.").  Recognition of a speaker's
voice is one way in which such authentication may occur, Fed. R.
Evid. 901(b)(5), along with indicia in the calls themselves, such as
the speakers' use of one another's name.  "The bar for familiarity is
not a high one.  This court has held that hearing a defendant's voice
once during a court proceeding satisfies the minimal familiarity
requirement."  United States v. Mendiola, 707 F.3d 735, 740 (7th Cir.
2013).

"Rule 901(b)(5) establishes a low threshold for voice
identifications -- an identifying witness need only be minimally
familiar with the voice he identifies."  United States v. Ortiz, 776
F.3d 1042, 1044-45 (9th Cir. 2015) (internal quotation marks
omitted).  "Once the offering party meets this burden, the probative
value of the evidence is a matter for the jury." Id. (internal
quotation marks omitted).  Witnesses may testify competently as to
the identification of a voice on a recording.  A witness's opinion
testimony in this regard may be based upon his having heard the voice
on another occasion under circumstances connecting it with the
alleged speaker.  Fed. R. Evid. 901(b)(5); United States v. Torres,
908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice recognition
constitutes sufficient authentication.").  In this case, the
government expects that SA Talamantez will authenticate the voices
heard and persons seen on the some of recordings because he has
direct personal knowledge of the persons on the recordings, and thus
can identify both the visual person and the audio.

Recorded conversations are competent evidence even when they are
partly inaudible, unless the unintelligible portions are so

1  substantial as to render the recording as a whole untrustworthy.

2  United States v. Rrapi, 175 F.3d 742, 746 (9th Cir. 1999).  Here, for

3  each recording at least one witness (many times multiple witnesses)

4  have reviewed and authenticated the audio.

5          2.   Transcripts of Recorded Statements

6      Due to the nature of the case and the evidence that the

7  government intends to introduce at trial, including jail calls,

8  intercepted wiretap calls, and kites, the government believes that

9  transcripts would serve as an aid to the jury while listening and

10  looking at these various recordings.  See United States v. Turner,

11  528 F.2d 143, 167-68 (9th Cir.1975), cert. denied, 429 U.S. 837, 97

12  S.Ct. 105, 50 L.Ed.2d 103 (1976); United States v. Taghipour, 964

13  F.2d 908, 910 (9th Cir. 1992); United States v. Fuentes-Montiji, 68

14  F.3d 352, 354-55 (9th Cir. 1995).  In particular, the government

15  intends to introduce hundreds of kites at trial, and because many of

16  the kites are written on small pieces of paper and contain small

17  handwriting or otherwise can be difficult to read, the government

18  believes that transcripts would serve as an aid to the jury while

19  reading the kites.

20      The government also intends to introduce audio recordings from

21  jail calls (including some involving the defendant) and a recorded

22  meeting between the defendant and a cooperating witness.  For the

23  recordings that are entirely in English, or where there is a de

24  minimis use of the Spanish language (such as greetings or

25  salutations), the recording is the evidence, not the transcript.  See

26  Ninth Cir. Crim. Model Jury Instr. No. 2.6 (Transcript of Recording

27  in English).

28

1     Some of the recordings, however, contain both the English and

2  Spanish languages.  For such recordings, the transcripts contain

3  italicized portions of the conversations or writings that were

4  translated from Spanish to English.  For those italicized, Spanish

5  portions, the transcript is the evidence, not the foreign language

6  spoken or written in the recording.  <u>See</u> Ninth Cir. Crim. Model Jury

7  Instr. No. 2.7 (Transcript of Recording in Foreign Language).  Where

8  there is no dispute as to the accuracy of the transcription, the

9  district court is well within its discretion to allow jurors to use

10  such transcripts and to permit such exhibits into the jury room.

11  <u>United States v. Pena-Espinoza</u>, 47 F.3d 356, 359 (9th Cir. 1995); <u>see</u>

12  <u>Fuentes-Montijo</u>, 68 F.3d at 355 ("Where, as here, a district court is

13  faced with a jury that includes one or more bilingual jurors and the

14  taped conversations are in a language other than English,

15  restrictions on the jurors who are conversant with the foreign tongue

16  is not only appropriate, it may in fact be essential.").

17    **B.   Case Agent's Lay Testimony Will Aid the Jury's**
   **Understanding of the Certain Evidence**

18

19     The government may seek to elicit lay testimony from the lead

20  case agent, FBI Special Agent Joseph Talamantez, regarding the

21  meaning of certain intercepted statements, based on his knowledge of

22  the investigation.  Lay opinion testimony is admissible if it is

23  (1) "rationally based on the perception of the witness," (2) "helpful

24  to a clear understanding of the witness's testimony or the

25  determination of a fact in issue[,]" and (3) "not based on

26  scientific, technical, or other specialized knowledge within the

27  scope of Rule 702."  Fed. R. Evid. 701.  In <u>United States v. Gadson</u>,

28  the Ninth Circuit has made clear that such testimony, where based on

the law enforcement witnesses' <u>personal observations</u> and <u>direct</u> <u>knowledge</u> of the investigation, falls under FRE 701 and does <u>not</u> qualify as expert testimony governed by FRE 702.

> In applying Rule 701 to the lay opinion testimony of law enforcement officers, we have held that an officer's interpretation of intercepted phone calls may meet Rule 701's "perception" requirement when it is an interpretation "of ambiguous conversations based upon [the officer's] direct knowledge of the investigation." <u>United States v. Freeman</u>, 498 F.3d 893, 904-05 (9th Cir. 2007); <u>see also</u> <u>United States v. Simas</u>, 937 F.2d 459, 464-65 (9th Cir. 1991) (finding no abuse of discretion in admitting officers' lay testimony "concerning their understanding of what [defendant] meant to convey by his vague and ambiguous statements").

763 F.3d 1189, 1206 (9th Cir. 2014).[6]

The Court went on:

> In <u>Kevin Freeman</u>, for instance, we held that once the government established a foundation, a police officer could provide lay witness opinion testimony regarding the meaning of statements in the defendant's intercepted phone calls because the testimony was based on the officer's "direct perception of several hours of intercepted conversations—in some instances coupled with direct observation of [the defendants]—and other facts he learned during the investigation." 498 F.3d at 904-05; <u>see also</u> <u>United States v. El-Mezain</u>, 664 F.3d 467, 513-14 (5th Cir. 2011) (allowing lay opinion testimony interpreting telephone calls when "the agents' opinions were limited to their personal perceptions from their investigation of this case"); <u>United States v. Rollins</u>, 544 F.3d 820, 830-33 (7th Cir. 2008) (finding no error in the district court's decision to allow the agent's testimony regarding his "impressions" of recorded conversations when the testimony was "based on the agent's perceptions derived from the investigation of this particular conspiracy").

---

[6] The majority of the circuits allow officers to provide interpretations of recorded conversations based on their knowledge of the investigation, subject to various safeguards. <u>See</u> <u>United States v. Albertelli</u>, 687 F.3d 439, 444-48 (1st Cir. 2012); <u>United States v. El-Mezain</u>, 664 F.3d 467, 513-14 (5th Cir. 2011); <u>United States v. Jayyousi</u>, 657 F.3d 1085, 1102-03 (11th Cir. 2011); <u>United States v. Rollins</u>, 544 F.3d 820, 830-33 (7th Cir. 2008); <u>United States v. Garcia</u>, 994 F.2d 1499, 1506-07 (10th Cir. 1993); <u>United States v. De Peri</u>, 778 F.2d 963, 977-78 (3d Cir. 1985).

1  Id at 1207-08.

2      Such testimony is admissible even if the testifying officer was

3  not a participant in the recorded conversation.  Kevin Freeman, 498

4  F.3d at 904; see also United States v. Jayyousi, 657 F.3d 1085, 1102

5  (11th Cir. 2011) (holding that a lay witness's testimony was

6  admissible even though "he did not personally observe or participate

7  in the defendants' conversations").

8      The reason such law enforcement testimony is regularly admitted

9  in criminal trials is because it serves an important jury function.

10     Lay witness testimony regarding the meaning of ambiguous
       conversations based on the witness's direct perceptions and
11     experience may also prove "helpful to the jury" for
       purposes of Rule 701.  See Kevin Freeman, 498 F.3d at 904-05
12     (agent's "understanding of ambiguous phrases" based on the
       "direct perception of several hours of intercepted
13     conversations" along with "direct observation" of
       defendants and "other facts he learned during the
14     investigation" resulted in testimony that "proved helpful
       to the jury in determining what the [co-conspirators] were
15     communicating during the recorded telephone calls"); see
       also Rollins, 544 F.3d at 832-33 (agent's testimony based
16     on listening to every intercepted conversation, and other
       "personal observations and perceptions" related to the
17     specific case at issue "assisted the jury in determining
       several facts in issue").

18

19  Gadson, 763 F.3d at 1207.

20     Here, SA Talamantez personally participated in basically every

21  significant investigative step in this case, which included listening

22  to essentially every recording, reading every kite, and being

23  physically present at almost every significant event.  As such, the

24  Circuit well supports their testimony whereby they will employ their

25  significant knowledge of the case to help the jury navigate and

26

27

28

                                  11

interpret the sometimes complex, concealed, or just chaotic recorded written or oral statements in this case.[7]

## C. Relevant Conspiracy Law

### 1. General Principles

"The agreement need not be explicit; it may be inferred from the defendant's acts pursuant to a fraudulent scheme or from other circumstantial evidence." United States v. Cloud, 872 F.2d 846, 852 (9th Cir. 1989). The government need not prove direct contact between co-conspirators or the existence of a formal agreement; instead, an agreement constituting a conspiracy may be inferred from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose. See United States v. Garza, 980 F.2d 546, 552-53 (9th Cir. 1992). Moreover, "[w]ithin reasonable limits, the precise date of the [conspiracy] offense is not required." United States v. Hultgren, 713 F.2d 79, 89 (5th Cir. 1983).

It is not necessary for the government to show that the defendant knew "the exact scope of the conspiracy, the identity and role of each of the co-conspirators, or the details of the operations

---

[7] Courts have admitted opinion testimony by law enforcement agents on a number of other issues too, such as (1) the modus operandi of drug traffickers, United States v. Espinosa, 827 F.2d 604, 612 (9th Cir. 1987) (holding that district court properly admitted law enforcement officer's expert testimony expert on the modus operandi of narcotics traffickers, including use of "stash pads" for drugs); (2) the use of guns by drug traffickers, United States v. Perez, 116 F.3d 840, 848 (9th Cir. 1997); and (3) a defendant's apparent attempt to avoid surveillance, United States v. Andersson, 813 F.2d 1450, 1458 (9th Cir. 1987). An experienced narcotics agent's opinion testimony may be based in part on information from other agents familiar with the issue. United States v. Beltran-Rios, 878 F.2d 1208, 1213 n.3 (9th Cir. 1989).

1   or any particular plan." United States v. Thomas, 586 F.2d 123, 132

2   (9th Cir. 1978).  However, the government must prove that the

3   defendant was aware of "the essential nature of the plan."

4   Blumenthal v. United States, 332 U.S. 539, 557 (1947).  See also

5   United States v. Krasovich, 819 F.2d 253, 255-56 (9th Cir. 1987).

6   The key element of proof as to any specific co-conspirator is the

7   showing that he knew, or had reason to know, of the participation of

8   others in the illegal plan, and that he knew, or had reason to know,

9   that the benefits to be derived from the operation were probably

10  dependent upon the success of the entire venture.  United States v.

11  Abushi, 682 F.2d 1289, 1293 (9th Cir. 1982).  Once a conspiracy is

12  proven, evidence establishing beyond a reasonable doubt the

13  defendant's connection to that conspiracy -- even if the connection

14  is slight -- is sufficient to convict him of knowingly participating

15  in the conspiracy.  United States v. Hubbard, 96 F.3d 1223, 1227 (9th

16  Cir. 1996).

17       Once a person becomes a member of a conspiracy, that person

18  remains a member until that person withdraws from it.  (9th Cir. MJI

19  8.24.)  "[E]stablishing individual withdrawal [is] a burden that

20  rest[s] firmly on the defendant regardless of when the purported

21  withdrawal took place." Smith v. United States, 133 S. Ct. 714, 719

22  (2013).  A conspirator can continue to be held accountable for acts

23  of conspirators after he has been arrested unless he has withdrawn.

24  United States v. Hill, 42 F.3d 914, 917 (5th Cir. 1995).

25  Additionally, there is no "automatic termination" rule simply because

26  the government has defeated the conspiracy's objective. See, e.g.,

27  United States v. Jimenez Recio, 537 U.S. 270, 275 (2003).  Finally,

28  because the crime of conspiracy is complete upon entering into an

1    unlawful agreement, despite the absence of an overt act, the

2    government does not have the burden to disprove a defendant's

3    withdrawal from the conspiracy.  <u>United States v. Francis</u>, 916 F.2d

4    464, 466 (8th Cir. 1990).  "Passive nonparticipation in the

5    continuing scheme is not enough to sever the meeting of the minds

6    that constitutes the conspiracy." <u>Smith</u>, 133 S. Ct. at 719.

7                    2.   <u>Racketeering Conspiracy</u>

8         The charge of racketeering conspiracy requires proof of criminal

9    activity by members of the LACJ Enterprise to show the enterprise's

10   nature and the requisite pattern of racketeering activity.  <u>See</u>

11   <u>Salinas v. United States</u>, 522 U.S. 52, 63-64 (1997) ("The partners in

12   the criminal plan must agree to pursue the same criminal objective

13   and may divide up the work, yet each is responsible for the acts of

14   each other . . . .  If [the RICO] conspirators have a plan which

15   calls for some conspirators to perpetrate the crime and others to

16   provide support, the supporters are as guilty as the perpetrators.")

17   (internal citation omitted); <u>c.f.</u> <u>United States v. DiNome</u>, 954 F.2d

18   839, 843 (2d Cir. 1992) ("Proof of [RICO] elements may well entail

19   evidence of numerous criminal acts by a variety of persons, and each

20   defendant in a RICO case may reasonably claim no direct participation

21   in some of those acts.  Nevertheless, evidence of those acts is

22   relevant to the RICO charges against each defendant[.]").  The

23   Supreme Court has also made clear that, for RICO conspiracies, "[a]

24   conspiracy may exist even if a conspirator does not agree to commit

25   or facilitate each and every part of the substantive offense."  <u>Id.</u>

26   at 63.  All that is required is that the defendant "knew about and

27   agreed to facilitate the scheme."  <u>Id.</u> at 66.

28

                                    14

1

      **D.   Co-Conspirator Statements**

2      Declarations by one co-conspirator during the course of and in

3 furtherance of the conspiracy may be used against another conspirator

4 because such declarations are not hearsay.  <u>See</u> Fed. R. Evid.

5 801(d)(2)(E).  Further, statements made in furtherance of a

6 conspiracy were expressly held by the Supreme Court in <u>Crawford v.</u>

7 <u>Washington</u>, 541 U.S. 36, 56 (2004) to be "not testimonial" such that

8 their admission does not violate the Confrontation Clause.  As such,

9 the admission of co-conspirator statements pursuant to Fed. R. Evid.

10 801(d)(2)(E) requires only a foundation that: (1) the declaration was

11 made during the life of the conspiracy; (2) it was made in

12 furtherance of the conspiracy; and (3) there is, including the co-

13 conspirator's declaration itself, sufficient proof of the existence

14 of the conspiracy and of the defendant's connection to it.  <u>See</u>

15 <u>Bourjaily v. United States</u>, 483 U.S. 171, 173, 181 (1987).

16      The government must prove by a preponderance of the evidence

17 that a statement is a co-conspirator declaration in order for the

18 statement to be admissible under Rule 801(d)(2)(E).  <u>Bourjaily</u>, 483

19 U.S. at 176; <u>United States v. Crespo de Llano</u>, 838 F.2d 1006, 1017

20 (9th Cir. 1987).  Whether the government has met its burden is to be

21 determined by the trial judge, and not the jury.  <u>United States v.</u>

22 <u>Zavala-Serra</u>, 853 F.2d 1512, 1514 (9th Cir. 1988).  The Court may

23 rely on inadmissible evidence, such as a co-conspirator's plea

24 agreement, in determining whether the 801(d)(2)(E) exception applies.

25 <u>Cf.</u> <u>United States v. Gil</u>, 58 F.3d 1414, 1420 (9th Cir. 1995) (the

26 preliminary determination of whether FRE 801(d)(2)(E) applies is to

27 be made "by the court, not the jury, pursuant to Fed. R. Evid.

28 104(a)); Fed. R. Evid. 104(a) ("the court must decide any preliminary

question about whether . . . evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege").

The trial court has discretion to determine whether the government may introduce co-conspirator declarations before establishing the conspiracy and the defendant's connection to it. United States v. Loya, 807 F.2d 1483, 1490 (9th Cir. 1987).  It also has the discretion to vary the order of proof in admitting a co-conspirator's statement.  Id.  The court may allow the government to introduce co-conspirator declarations before laying the required foundation under the condition that the declarations will be stricken if the government fails ultimately to establish by independent evidence that the defendant was connected to the conspiracy.  Id.; United States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1083 (9th Cir. 1982).

To be admissible under Federal Rule of Evidence 801(d)(2)(E) as a statement made by a co-conspirator in furtherance of the conspiracy, a statement must "further the common objectives of the conspiracy," or "set in motion transactions that [are] an integral part of the [conspiracy]."  United States v. Arambula-Ruiz, 987 F.2d 599, 607-08 (9th Cir. 1993); United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988).  Such statements are admissible whether or not they actually result in any benefit to the conspiracy.  United States v. Williams, 989 F.2d 1061, 1068 (9th Cir. 1993); United States v. Schmit, 881 F.2d 608, 612 (9th Cir. 1989).  Thus, co-conspirator declarations need not be made to a member of the conspiracy to be admissible under Rule 810(d)(2)(E) and can be made to government informants and undercover agents.  Zavala-Serra, 853

1   F.2d at 1516 (statements to informants and undercover agents); United

2   States v. Tille, 729 F.2d 615, 620 (9th Cir. 1984) (statements to

3   informants); United States v. Echeverry, 759 F.2d 1451, 1457 (9th

4   Cir. 1985) (statements to undercover agent). Declarations of an

5   unindicted co-conspirator made in furtherance of the conspiracy may

6   be used against a charged conspirator.  See United States v. Nixon,

7   418 U.S. 683, 701 (1974); Williams, 989 F.2d at 1067.

8       Courts have interpreted the "in furtherance of" requirement

9   broadly and have considered, among others, the following co-

10  conspirator declarations as being made "in furtherance of the

11  conspiracy":

12      1.   statements made to induce enlistment in the conspiracy

13  (United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir.

14  1993));

15      2.   statements made to keep a conspirator abreast of a co-

16  conspirator's activity, to induce continued participation in a

17  conspiracy, or to allay the fears of a co-conspirator (Arias-

18  Villanueva, 998 F.2d at 1502); see also United States v. Ammar, 714

19  F.2d 238, 252 (3d Cir. 1983) ("[s]tatements between conspirators

20  which provide reassurance, serve to maintain trust and cohesiveness

21  among them, or inform each other of the current status of the

22  conspiracy further the ends of the conspiracy . . . .");

23      3.   statements made to prompt action in furtherance of the

24  conspiracy by either of the participants to the conversation (United

25  States v. Layton, 720 F.2d 548, 556 (9th Cir. 1983));

26      4.   statements related to the concealment of the criminal

27  enterprise (Tille, 729 F.2d at 620); Garlington v. O'Leary, 879 F.2d

28  277, 283 (7th Cir. 1989));

5.    statements seeking to control damage to an ongoing conspiracy (Garlington, 879 F.2d at 283);

6.    statements made to reassure members of the conspiracy's continued existence (Yarbrough, 852 F.2d at 1535);

7.    statements by a person involved in the conspiracy to induce a buyer's purchase of contraband by assuring the buyer of the person's ability to consummate the transaction (Echeverry, 759 F.2d at 1457);

8.    statement identifying another co-conspirator as source for the contraband to be sold to purchaser (United States v. Lechuga, 888 F.2d 1472, 1480 (5th Cir. 1989));

9.    "bragging," boasts and other conversation designed to obtain the confidence, or allay the suspicions, of another conspirator (or apparent conspirator who actually was an undercover agent) (United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988); Lechuga, 888 F.2d at 1480; United States v. Miller, 664 F.2d 94, 98 (5th Cir. 1981)); and

10.   statements that refer to another conspirator as the boss, the overseer, or sir (United States v. Barnes, 604 F.2d 121, 157 (2d Cir. 1979)).

**E.    Other Hearsay Exceptions**

1.    <u>Past Recollection Recorded</u>

Under Federal Rule of Evidence 803(5), a record may be read into evidence if it (1) is on a matter the witness once knew about but now cannot recall well enough to testify truthfully and accurately; (2) was made or adopted by the witness when the matter was fresh in the witness's memory; and (3) accurately reflects the witness's knowledge.  Fed. R. Evid. 803(5).

1

        2.   <u>Present Sense Impression</u>

2

    Under Federal Rule of Evidence 803(1), a statement "describing

3

or explaining an event or condition, made while or immediately after

4

the declarant perceived it," is admissible.

5

        3.   <u>Defendants' Hearsay Statements</u>

6

    Defendant's statements are admissible only if offered against

7

them -- otherwise, they fall within the scope of the rule against

8

hearsay.  Fed. R. Evid. 801(d)(2)(A); <u>United States v. Fernandez</u>, 839

9

F.2d 639, 640 (9th Cir. 1988).  The hearsay rule prohibits a

10

defendant from obtaining the benefit of testifying without subjecting

11

himself to cross-examination by placing his self-serving prior

12

statements before the jury through other witnesses.  Fed. R. Evid.

13

801(c); <u>Fernandez</u>, 839 F.2d at 640; <u>United States v. Waters</u>, 627 F.3d

14

345, 385 (9th Cir. 2010) (holding that defendant's exculpatory

15

statement proclaiming innocence "is clearly hearsay, and was

16

therefore properly excluded under Rule 801(a)"); <u>United States v.</u>

17

<u>Ortega</u>, 203 F.3d 675, 682 (9th Cir. 2000) (holding that district

18

court did not commit error by prohibiting defendant from cross-

19

examining government witness concerning false exculpatory statements

20

made during the same interview in which defendant made inculpatory

21

statements).

22

    **F.   Business Records**

23

    At trial, the government anticipates offering several sets of

24

business records into evidence, including jail calls and visitation

25

records.  Such records of "regularly conducted activity" fall within

26

an exception to the rule against hearsay and are admissible either

27

through "the testimony of the custodian or another qualified witness"

28

or "by a certification that complies with Rule 902(11)."  Fed. R.

1    Evid. 803(6)(D).  In this case, after the defendant rejected the

2    government's proposed stipulations, the government has chosen the

3    latter option with respect to certain records.  The government

4    previously provided copies of those records in discovery to defense

5    counsel and has or will provide the corresponding certifications by

6    appropriately qualified custodians of records, thereby affording

7    opposing counsel "a fair opportunity to challenge them."  Fed. R.

8    Evid. 902(11).  To date, defendant has not raised any objection to

9    the admission of any of these business records.

10         **G.   Charts and Summaries**

11         The government will use charts and summaries in order to

12    streamline its case-in-chief and provide an aid to the jury.  Under

13    FRE 1006, the Court may admit summaries into evidence where those

14    summaries are based on voluminous, already-admitted exhibits.  See,

15    e.g. United States v. Anekwu, 695 F.3d 967 (9th Cir. 2012) (while

16    noting that "we do not approve of receiving summary exhibits of

17    material already in evidence, we have not reversed for that reason

18    . . . [with limiting instructions and the opportunity to cross-

19    examine the agent who prepared the summaries], we cannot conclude

20    that the district court abused its discretion in admitting both the

21    summary chart and underlying records into evidence") (internal

22    citations and quotations omitted); see also United States v. Rizk,

23    660 F.3d 1125, 1130-31 (9th Cir. 2011) (finding that district court

24    did not abuse discretion in admitting summary charts of admissible

25    (though not admitted) material, since "Rule 1006 permits admission of

26    summaries based on voluminous records that cannot readily be

27    presented in evidence to a jury and comprehended"); see also United

28    States v. Boulware, 470 F.3d 931, 936 (9th Cir. 2006) (upholding

district court's decision to admit summary chart of already-admitted evidence where district court "no doubt believed that it would be helpful to have the voluminous financial materials reduced to summary form").

The government will seek to admit a summary chart of the visitation records in this case, which documents the dates, locations, and names and monikers of the inmates defendant visited during his participation in the racketeering and drug trafficking conspiracies.  Because there will be multiple individuals discussed and identified throughout trial, the government may request the use of individual charts for each juror or a large poster-board sized chart of referenced-participants in defendant's enterprise that the jury can see throughout the trial.  See, e.g. United States v. Yeley-Davis, 632 F.3d 673, 685 (10th Cir. 2011) (approving use of "photo-arrays of the individuals alleged to be a part of the conspiracy"; district court's admission of chart was proper in part because court offered limiting instruction that the chart did not "prove any elements of the crimes charged").[8]  The government believes that this exhibit will be particularly helpful for the jury during any testimony that implicates the co-conspirators, each of whom has their own true name, gang moniker, nicknames, and variations of each.  In other words, such a face sheet will enable the jury (and the Court

---

[8] In late 2012, in United States v. Rafael Munoz-Gonzalez, et al., CR 10-567-AHM, the Honorable Judge Matz (retired), ordered the undersigned that the government develop and display such a chart and admit it as a Court exhibit at the start of the trial.  Judge Matz directed the use of such a chart in order for the jury, the court, and the parties to better keep track of the testimony throughout the proceeding.

and the parties) to better follow the narrative of the testimony and the role of each person discussed.

The government believes that such a chart would significantly aid the jury and provide context for the case, and that it can be limited by an appropriate instruction at the time of its admission indicating that such a chart is evidence but is not, standing alone, conclusive of any element.

### H.   Photographs

The government intends to introduce dozens of photographs taken from the various meetings, search warrants, and seized items. Photographs are generally admissible as evidence under Rule 401. See United States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977) (photographs of crime scene admissible).  Photographs should be admitted so long as they fairly and accurately represent the event or object in question.  United States v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978).  Also, "[p]hotographs are admissible as substantive as well as illustrative evidence."  United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).  Photographs may be authenticated by a witness who "identif[ies] the scene itself [in the photograph] and its coordinates in time and place."  See Lucero v. Stewart, 892 F.2d 52, 55 (9th Cir. 1989) (internal quotation marks omitted).

The photograph is authenticated if the witness testifies that it is an accurate representation of facts of which the witness has personal knowledge, and "the witness who lays the authentication foundation need not be the photographer, nor need the witness know anything of the time, conditions, or mechanisms of the taking of the picture."  32 McCormick On Evid. § 215 (7th ed.); see also Fed. R. Evid. 1002 advisory committee's note.  Thus, for example, it is

suitable for a witness to identify a photograph by the individuals depicted in it regardless of his knowledge of the particular circumstances under which the photograph was taken.  "Under the Federal Rules, the witness identifying the item in a photograph need only establish that the photograph is an accurate portrayal of the item in question."  People of Territory of Guam v. Ojeda, 758 F.2d 403, 408 (9th Cir. 1985).  Indeed, "[a] photograph can be authenticated by someone other than the photographer if he recognizes and identifies the object depicted and testifies that the photograph fairly and correctly represents it." See United States v. Winters, 530 F. App'x 390, 395 (5th Cir. 2013) (citations/quotations omitted).

### I.   Physical Evidence

The will seek to introduce physical evidence recovered during the investigation, including drugs, kites, notebooks, cell phones, and weapons, as well as, as discussed above, recorded oral statements.  Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must provide evidence sufficient to support a finding that the item is what the proponent claims it is." Accordingly, under Rule 901, issues of authenticity and identification are treated as "a special aspect of relevancy."  Fed. R. Evid. 901(a) (Advisory Committee Notes).

Rule 901(a) only requires the government to make a prima facie showing of authenticity or identification "so that a reasonable juror could find in favor of authenticity or identification." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991) (quoting United States v. Blackwood, 878 F.2d 1200, 1202 (9th Cir. 1989) (per curiam)).  The authenticity of proposed exhibits may be proven by

1    circumstantial evidence.  See United States v. King, 472 F.2d 1, 9–11

2    (9th Cir. 1972).  If the government makes a prima facie showing of

3    authenticity, the Court should admit the evidence.  See United States

4    v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).  The credibility or

5    probative force of the evidence offered is ultimately an issue for

6    the trier of fact.  Chu Kong Yin, 935 F.2d at 996 (internal quotation

7    marks omitted).

8        To be admitted into evidence, a physical exhibit must be in

9    substantially the same condition as when the crime was committed.

10    Fed. R. Evid. 901.  The Court may admit the evidence if there is a

11    "reasonable probability the article has not been changed in important

12    respects."  United States v. Harrington, 923 F.2d 1371, 1374 (9th

13    Cir. 1991) (quoting Gallego v. United States, 276 F.2d 914, 917 (9th

14    Cir. 1960)).  This determination is to be made by the trial judge and

15    will not be overturned except for clear abuse of discretion.  Factors

16    the Court may consider in making this determination include the

17    nature of the item, the circumstances surrounding its preservation,

18    and the likelihood of intermeddlers having tampered with it.

19    Gallego, 276 F.2d at 917.

20        In establishing chain of custody as to an item of physical

21    evidence, the government is not required to call all persons who may

22    have come into contact with the piece of evidence.  Harrington, 923

23    F.2d at 1374.  Moreover, a presumption of regularity exists in the

24    handling of exhibits by public officials.  Id.  Therefore, to the

25    extent that alleged or actual gaps in the chain of custody exist,

26    such gaps go to the weight of the evidence rather than to its

27    admissibility.  Id.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## J.   Electronic Records

The government intends to introduce electronic records, including data seized from digital devices.  Like other evidence, electronic data can be authenticated in a variety of ways, including by a case agent with knowledge of the investigation.  See United States v. Salcido, 506 F.3d 729, 733 (9th Cir. 2007) ("[T]he government properly authenticated the videos and images under Rule 901 by presenting detailed evidence as to the chain of custody, specifically how the images were retrieved from the defendant's computers"); United States v. Safavian, 435 F. Supp. 2d 36, 40 (D.D.C. 2006) (quoting Fed. R. Evid. 901(b)(4) (contents of email messages authenticated by its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"); United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990) ("[t]he government may authenticate a document solely through the use of circumstantial evidence, including the document' s own distinctive characteristics and the circumstances surrounding its discovery"); United States v. Siddiqui, 235 F.3d 1318, 1322–23 (11th Cir. 2000) (emails sufficiently authenticated by content and context by examining what was said in the messages as well as nicknames used within the messages).  "The bar for authentication of evidence is not particularly high."  See generally United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007) (citation omitted).

## K.   Prison and Jail Records of Inmates

Prison and jail records identifying an inmate and documenting the bases and terms of incarceration (e.g., fingerprints, photographs, and records of a judgment and sentence contained in an

inmate's 'penitentiary packet') "are public records of routine and non-adversarial matters that fall within Rule 803(8)(B), and [are] admissible thereunder." See United States v. Weiland, 420 F.3d 1062, 1074-75 (9th Cir. 2005) (fingerprinting and photographing a suspect, and cataloguing a judgment and sentence are the types of routine and unambiguous matters to which the public records hearsay exception in Rule 803(8)(B) is designed to apply"); United States v. Orozco, 590 F.2d 789, 794 (9th Cir. 1979); United States v. Watson, 650 F.3d 1084, 1090-91 (8th Cir. 2011) (holding that "penitentiary records containing booking photos and fingerprint cards . . . were admissible as self-authenticating public records and admission did not violate the Confrontation Clause").

### L.   Use of Exhibits During Opening Statement

Exhibits may be used by the government in the opening statement, and so long as the opening statement "avoids references to matters that cannot be proved or would be inadmissible, there can be no error, much less prejudicial error." United States v. De Peri, 77826 F.2d 963, 979 (3d Cir. 1985); see also United States v. Rubino, 43127 F.2d 284, 290 (6th Cir. 1970).

In particular, the government currently believes it will likely use photographs of the relevant individuals, kites and other writings, screenshots of video recordings, and surveillance photos. The government intends to identify the photographs that it will use in its opening to the defense.

### M.   Cross-Examination of Defendant

A defendant who testifies at trial may be cross-examined as to all matters reasonably related to the issues he or she puts in dispute during direct examination.  "A defendant has no right to

1   avoid cross-examination on matters which call into question his claim

2   of innocence." United States v. Miranda-Uriarte, 649 F.2d 1345,

3   1353-54 (9th Cir. 1981).  The government is not required to provide

4   notice of matters about which it may seek to cross-examine defense

5   witnesses, including defendant, should they testify.

6   **N.  Character Evidence**

7        The Supreme Court long ago recognized that character evidence --

8   particularly cumulative character evidence -- has weak probative

9   value and great potential to confuse the issues and prejudice the

10  jury.  See Michelson v. United States, 335 U.S. 469, 480, 486 (1948).

11  The Court has thus given trial courts wide discretion to limit the

12  presentation of character evidence.  Id.

13       In addition, the form of the proffered evidence must be proper.

14  Federal Rule of Evidence 405(a) sets forth the sole methods for which

15  character evidence may be introduced.  It specifically states that,

16  where evidence of a character trait is admissible, proof may be made

17  in two ways: (1) by testimony as to reputation and (2) by testimony

18  as to opinion.  Thus, a defendant may not introduce specific

19  instances of his or her good conduct through the testimony of others.

20  See Michelson, 335 U.S. at 477.  On cross-examination of a

21  defendant's character witness, however, the government may inquire

22  into specific instances of a defendant's past conduct relevant to the

23  character trait at issue.  See Fed. R. Evid. 405(a).  In particular,

24  a defendant's character witnesses may be cross-examined about their

25  knowledge of the defendant's past crimes, wrongful acts, and arrests.

26  See Michelson, 335 U.S. at 481.  The only prerequisite is that there

27  must be a good faith basis that the incidents inquired about are

28

1  relevant to the character trait at issue.  See United States v.

2  McCollom, 664 F.2d 56, 58 (5th Cir. 1981).

3        **O.   Jury Nullification and Other Improper Defenses**

4        To the extent defendant attempts to raise improper defenses, the

5  Court should exclude any evidence or argument relating to any

6  possible jury nullification defense.  It is well-established that a

7  defendant does not have a right to a jury nullification instruction.

8  United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992).  Having

9  no right to seek jury nullification, defendant has no right to

10 present evidence relevant only to such a defense.  Zal v. Steppe, 968

11 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a

12 defendant nor his attorney has a right to present to a jury evidence

13 that is irrelevant to a legal defense to, or an element of, the crime

14 charged.  Verdicts must be based on the law and the evidence, not on

15 jury nullification as urged by either litigant.").  And, in any

16 event, under Federal Rules of Evidence 401 and 403, such arguments or

17 evidence are not relevant to any valid defense to the offense charged

18 and will unnecessarily confuse the issues and mislead the jury.

19       In particular, the defendant in this case should not be

20 permitted to introduce evidence concerning his familial ties, any

21 role he may have as a caregiver or financial provider for their

22 family, religious affiliations, or difficult upbringings, since none

23 is relevant to any material issue and their minimal probative value

24 is substantially outweighed by the risk of unfair prejudice and

25 confusion of the issues.  See Fed. R. Evid. 401, 403.

26       **P.  Jury Questions**

27       Under the law of this circuit, "[t]he necessity, extent and

28 character of additional instructions are matters within the sound

28

1   discretion of the trial court." United States v. Collom, 614 F.2d
2   624, 631 (9th Cir. 1979) (citations omitted).  However, the district
3   court has an obligation, when a jury requests clarification on an
4   issue, to "clear away the confusion 'with concrete accuracy.'"
5   United States v. McCall, 592 F.2d 1066, 1068 (9th Cir. 1979) (quoting
6   Bollenbach v. United States, 326 U.S. 607, 612-13 (1946).  In some
7   circumstances, this may require giving a supplementary jury
8   instruction.  United States v. McIver, 186 F.3d 1119, 1130 (9th Cir.
9   1999) ("By asking 'what is manufacturing?' the jury clearly indicated
10  its confusion on this issue. The district court correctly decided
11  that the jury instructions were inadequate without a definition of
12  manufacturing. Rather than 'confusing the jury' by giving the
13  instruction, as [defendants] contend, the district court judge was
14  eliminating confusion, as required by McCall.")

15      Thus, the district court may provide specific answers to a
16  jury's questions when the jury has "ma[de] explicit its difficulties
17  [with the law]." United States v. Frega, 179 F.3d 793, 809 (9th Cir.
18  1999).  Where the jury has shown such confusion, a general response
19  that simply directs the jury to the court's instructions can be
20  deemed confusing and misleading.  Id. at 810.  (district court
21  committed error where it responded to a jury question by "telling the
22  jury that it could consider 'all of the evidence that [it had] heard
23  or seen during the trial . . . as to all counts'").  Thus, upon a
24  showing of confusion the Court may direct jurors to specific jury
25  instructions and/or may provide supplemental instructions, provided
26  neither are incorrect statements of the law.  McIver, 186 F.3d at
27  1131 (No plain error because "the supplemental instruction consisted
28  of a correct statement of law. The court merely defined a term used

in the original charge to the jury, and the instruction was essential to clear up the jury's confusion.").

## IV.   THE CASE AGAINST DEFENDANT

The indictment describes how the Mexican Mafia controls jails and prisons throughout California and other states for the profit of its members.  The indictment also describes how the Mexican Mafia leverages that control to also control Hispanic street gangs in southern California.  The indictment also describes how the Los Angeles County jail is the largest, most profitable facility controlled by the Mexican Mafia and how the enterprise that controls the Los Angeles County jail plays a key role in furthering Mexican Mafia business.

At a higher level, the indictment describes that defendant "would act as [a] facilitator for [a] full member[] of the Mexican Mafia who was also a member of the Mexican Mafia LACJ Enterprise and would act with the authority of that Mexican Mafia LACJ Enterprise member in directing the criminal activities of the Mexican Mafia LACJ Enterprise, including extortion and the sale of controlled substances"  and "would use his position as an attorney to assist defendant JOSE LANDA-RODRIGUEZ, and co-conspirators Luis Garcia and DMM-2, and other co-conspirators, with activities inside and outside the Los Angeles County Jail System."  (First Superseding Indictment at p.19.)

Defendant played his role in that enterprise by furthering a series of events through the commission of the related overt acts and other acts.  Specifically, the government will present evidence of defendant's participation in the following events and overt acts:

### A.   Defendant GABRIEL ZENDEJAS-CHAVEZ Hosts an Eme Meeting at his Law Office

Overt Act No. 178:  On February 4, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ met with defendant RAFAEL LEMUS, co-conspirator Miguel Rodriguez, DMM-2, and others in defendant GABRIEL ZENDEJAS-CHAVEZ's law office to discuss Eme business, including the passing of messages to Eme members in California State Prison by defendant GABRIEL ZENDEJAS-CHAVEZ, the passing of messages to defendant JOSE LANDA-RODRIGUEZ, obtaining drugs for DMM-2 to have sold, and problems La Eme was having with A.E., an Eme member in bad standing, and his brother G.E.

### B.   Defendant GABRIEL ZENDEJAS-CHAVEZ Uses His Status as an Attorney to Meet With and Pass Messages to Mexican Mafia Members in Pelican Bay State Prison

Overt Act No. 180:  On February 18, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ used his status as an attorney to visit and pass messages to Mexican Mafia member 1, Mexican Mafia member 2, Mexican Mafia member 3, Mexican Mafia member 4, and Mexican Mafia member 5.

Overt Act No. 181:  On February 18, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ attempted to smuggle a written message to a Mexican Mafia member at the Security Housing Unit at Pelican Bay State Prison.

Overt Act No. 182:  On February 19, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ used his status as an attorney to visit and pass messages to Mexican Mafia member 6, Mexican Mafia member 7, Mexican Mafia member 8, Mexican Mafia member 9, and Mexican Mafia member 10.

### C. Defendant GABRIEL ZENDEJAS-CHAVEZ and UICC-38 Discuss Collecting and Laundering Mexican Mafia LACJ Enterprise Proceeds

Overt Act No. 183:  On March 27, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ, via text-message, directed UICC-38 to bring kitty proceeds to his law office.

Overt Act No. 184:  On April 9, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ, via text-message, directed UICC-38 to send him $1,000.

Overt Act No. 185:  On April 9, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ, via text-message, agreed to deliver $300 to each of two Mexican Mafia members at the ADX Florence federal prison in Colorado.

Overt Act No. 186:  On April 10, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ exchanged text messages with UICC-38 in which he agreed to deliver $400 to two persons in Colorado and to keep $200 for himself.

Overt Act No. 187:  On April 12, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ travelled to the ADX Florence federal prison in Colorado to visit Mexican Mafia member 11.

Overt Act No. 188:  On April 14, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ, via text-message, provided co-conspirator Donato Gonzales's name and booking number to UICC-38 so she could forward Mexican Mafia LACJ Enterprise proceeds to co-conspirator Donato Gonzales.

Overt Act No. 189:  On April 18, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ told UICC-38 that he had money to return to her because one of the Mexican Mafia members in Colorado could not have visitors.

D. **Defendant GABRIEL ZENDEJAS-CHAVEZ Facilitates the Extortion of the Mongols Outlaw Motorcycle Gang and the Intimidation of a Victim of a Jail Stabbing**

Overt Act No. 190:  On April 8, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ used his status as an attorney to meet co-conspirator Luis Garcia and discuss Mexican Mafia business including the Mexican Mafia's extortion of the Mongols outlaw motorcycle gang and that they would be extorting the Mongols outlaw motorcycle gang for $100,000.

Overt Act No. 191:  On April 8, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ agreed to travel to Pelican Bay State Prison on June 25, 2014, to get support for the extortion proposal from other Mexican Mafia members.

Overt Act No. 192:  On April 8, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ agreed to contact unindicted co-conspirator 39 ("UICC-39") to tell co-conspirator Luis Garcia's stabbing victim, M.A., not to cooperate with law enforcement in exchange for being taken off the "Green Light" list.

Overt Act No. 193:  On April 8, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ explained to co-conspirator Luis Garcia how to use the legal system to delay his trial in order to remain in LACJ as a facilitator.

Overt Act No. 194:  On April 9, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ, via text-message, directed UICC-38 to send him $1,000 and UICC-39's phone number per the instructions of defendant LUIS GARCIA.

Overt Act No. 195:  On April 23, 2014, via text-message, UICC-38 sent defendant GABRIEL ZENDEJAS-CHAVEZ a phone number for the national president of the Mongols outlaw motorcycle gang.

Overt Act No. 196:  On June 25, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ used his status as an attorney to meet with and pass messages to Mexican Mafia member 1, Mexican Mafia member 4, Mexican Mafia member 6, Mexican Mafia member 8, and Mexican Mafia member 10 at Pelican Bay State Prison.

**E.   Smuggling of Heroin and Methamphetamine into LACJ**

Overt Act No. 239:  From April 18, 2014, through April 20, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ, co-conspirators Donato Gonzales and Alvaro Ruiz, and unindicted co-conspirator Frank Herrera, arranged for heroin and methamphetamine to be smuggled into MCJ.

Overt Act No. 240:  On April 22, 2014, unindicted co-conspirator Martin Salazar possessed and hid approximately 2.37 grams of heroin and 7.75 grams of methamphetamine that had been smuggled into LACJ by unindicted co-conspirator Ramon Amaya on behalf of the Mexican Mafia LACJ Enterprise.

Overt Act No. 241:  Between April 25, 2014, and May 9, 2014, co-conspirator Donato Gonzales wrote a kite to co-conspirator Luis Garcia that the "legal team" had sent drugs to co-conspirator Donato Gonzales and asked co-conspirator Luis Garcia to look out for those drugs.

Overt Act No. 242:  On June 2, 2014, co-conspirator Donato Gonzales wrote a coded letter, disguised as legal mail, to defendant GABRIEL ZENDEJAS-CHAVEZ stating that he had not received the heroin and methamphetamine.

**F.   Defendant GABRIEL ZENDEJAS-CHAVEZ Uses His Status as an Attorney to Pass Mexican Mafia Orders Regarding Assaults, Murder, and Drug Trafficking**

Overt Act No. 243:  On April 22, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ used his status as an attorney to meet with co-

conspirator Luis Garcia and pass an order that "Dreamer" from the 18th Street gang, "Demon" from 18th Street gang, and "Blanco" from the VNE gang be assaulted or killed, pass messages from Mexican Mafia members at the ADX Florence federal prison, discuss other Mexican Mafia business including obtaining drugs from Mexican drug cartels, and report that he would be travelling to Mexico to work on an alliance with a drug cartel.

Overt Act No. 244: Between May 5, 2014, and May 11, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ travelled to Mexico.

**G. Between May 5, 2014, and May 11, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ travelled to Mexico.**
**Defendant GABRIEL ZENDEJAS-CHAVEZ Used his Status to Pass Mexican Mafia Messages to JOSE LANDA-RODRIGUEZ**

Overt Act No. 245: On April 22, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ used his status as an attorney to meet with defendant JOSE LANDA-RODRIGUEZ and pass a message from Mexican Mafia member 11 that Federal Mexican Mafia members would not be recognizing three State Mexican Mafia members as brothers.

Overt Act No. 246: On April 22, 2014, during his meeting with defendant JOSE LANDA-RODRIGUEZ, defendant GABRIEL ZENDEJAS-CHAVEZ passed a message from DMM-2 about removing A.E. from Mexican Mafia membership.

Overt Act No. 247: Between April 22, 2014, and April 25, 2014, defendant JOSE LANDA-RODRIGUEZ passed a message to co-conspirator Donato Gonzales to confirm that A.E. was being removed from Mexican Mafia membership.

Overt Act No. 248: From April 25, 2014, through May 9, 2014, defendant JOSE LANDA-RODRIGUEZ directed co-conspirator Luis Garcia to have defendant GABRIEL ZENDEJAS-CHAVEZ use his status as an attorney

1   to obtain documentation that a Mexican Mafia associate was

2   cooperating with law enforcement to justify the murder of that

3   Mexican Mafia associate.

4       **H.   Defendant GABRIEL ZENDEJAS-CHAVEZ Uses His Status as an
        Attorney to Discuss Mexican Mafia Business**

5

6       Overt Act No. 251:  On April 28, 2014, and May 5, 2014,

7   defendant GABRIEL ZENDEJAS-CHAVEZ used his status as an attorney to

8   meet separately with defendant JOSE LANDA-RODRIGUEZ and co-

9   conspirators Luis Garcia and Donato Gonzales, and at LACJ.

10      Overt Act No. 252:  On April 28, 2014, and May 5, 2014, in

11  meetings at LACJ, defendant GABRIEL ZENDEJAS-CHAVEZ informed co-

12  conspirator Luis Garcia: that Federal Mexican Mafia members at the

13  ADX Florence federal prison had not voted for Mexican Mafia

14  membership for "Psycho"; that Mexican Mafia member 11 had placed

15  "Wolf" in charge of the 18th Street gang; that Mexican Mafia member 9

16  had advised that Deceased Mexican Mafia members 3 and 4 were feuding,

17  and to not get dragged into the feud; and to hold off on the assaults

18  of "Dreamer" from the 18th Street gang, "Demon" from 18th Street

19  gang, and "Blanco" from the VNE gang, that they had previously

20  discussed.

21      **I.   Defendant GABRIEL ZENDEJAS-CHAVEZ Informs Others that Luis
        Garcia had Dropped Out of the Mexican Mafia**

22

23      Overt Act No. 257:  On May 28, 2014, in a recorded telephone

24  call, defendants GABRIEL ZENDEJAS-CHAVEZ and JOSE LANDA-RODRIGUEZ

25  discussed the fact that co-conspirator Luis Garcia had "dropped-out"

26  of the Mexican Mafia and should not be included in Mexican Mafia

27  business any longer.

28

1    Overt Act No. 258:  From May 28, 2014, through at least May 30,

2  2014, defendant GABRIEL ZENDEJAS-CHAVEZ informed other co-

3  conspirators that co-conspirator Luis Garcia had "dropped-out" of the

4  Mexican Mafia.

5    Overt Act No. 259:  Between May 18, 2014, and July 16, 2014,

6  defendant GABRIEL ZENDEJAS-CHAVEZ wrote, in correspondence disguised

7  as legal mail, to Mexican Mafia member 12 at Pelican Bay State Prison

8  that co-conspirator Luis Garcia had "dropped-out" of the Mexican

9  Mafia.

10    **J.   Directions to Send Mexican Mafia LACJ Enterprise Business
          and Proceeds Through Defendant GABRIEL ZENDEJAS-CHAVEZ**

11

12    Overt Act No. 260:  On August 30, 2014, unindicted co-

13  conspirator 43 ("UICC-43") possessed a kite written by another

14  unknown co-conspirator directing that Mexican Mafia LACJ Enterprise

15  proceeds from drug sales in LACJ and kitty money from LACJ should be

16  sent to defendant GABRIEL ZENDEJAS-CHAVEZ and directing that co-

17  conspirator Ernesto Vargas be recognized as having the authority to

18  run NCCF.

19    **K.   Conspiracy to Remove Mexican Mafia Member A.E. From Power
          and to Take Over His Territories**

20

21    Overt Act No. 290:  On or before April 25, 2014, defendant JOSE

22  LANDA-RODRIGUEZ wrote a kite to co-conspirator Donato Gonzales to

23  inform him that defendant JOSE LANDA-RODRIGUEZ, DMM-2, and other

24  Mexican Mafia members intended to strip Mexican Mafia membership from

25  A.E.

26    Overt Act No. 291:  On or before April 25, 2014, defendant JOSE

27  LANDA-RODRIGUEZ wrote a kite to co-conspirator Luis Garcia to inform

28

him that defendant JOSE LANDA-RODRIGUEZ, DMM-2, and other Mexican Mafia members intended to strip Mexican Mafia membership from A.E.

Overt Act No. 292:  On or before April 25, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ passed a message from DMM-2 to defendant JOSE LANDA-RODRIGUEZ regarding the decision to strip Mexican Mafia membership from A.E.

Overt Act No. 293:  On June 30, 2014, in a recorded telephone conversation, defendant JOSE LANDA-RODRIGUEZ and unindicted co-conspirator 45 ("UICC-44") discussed threatening the life of D.C. because of his alignment with Mexican Mafia member A.E. and his collecting of taxes in areas controlled by defendant JOSE LANDA-RODRIGUEZ.

Overt Act No. 294:  In or around August 2014, defendants GABRIEL ZENDEJAS-CHAVEZ and RAFAEL LEMUS, and co-conspirators Ernesto Vargas and Miguel Rodriguez met at defendant GABRIEL ZENDEJAS-CHAVEZ's law office and discussed A.E. being removed from the Mexican Mafia and other members taking over his territories.

Overt Act No. 295:  On September 14, 2014, an unknown co-conspirator killed D.C. because of his alignment with A.E. and his collection of taxes in areas controlled by defendant JOSE LANDA-RODRIGUEZ.

Overt Act No. 296:  On October 22, 2014, co-conspirator Miguel Rodriguez passed a message to defendant JOSE LANDA-RODRIGUEZ from defendant RAFAEL LEMUS that Mexican Mafia members were in agreement about stripping A.E. of his membership and taking over his territories.

Overt Act No. 297:  On November 11, 2014, an unknown co-conspirator killed G.E. because of his alignment with A.E.

1

2

### L.   Defendant GABRIEL ZENDEJAS-CHAVEZ Used His Status as an Attorney to Pass Messages About Mexican Mafia Business

3

Overt Act No. 298:  On September 2, 2014, September 3, 2014, and

4 October 1, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ used his status as

5 an attorney to visit ten Mexican Mafia members at Pelican Bay State

6 Prison, including Mexican Mafia member 4, and pass messages about new

7 Mexican Mafia members and about the identity of possible cooperators.

8

Overt Act No. 299:  Between October 1, 2014, and October 22,

9 2014, after visiting Pelican Bay State Prison, defendant GABRIEL

10 ZENDEJAS-CHAVEZ reported to defendant RAFAEL LEMUS and co-conspirator

11 Miguel Rodriguez that: defendant GABRIEL ZENDEJAS-CHAVEZ had found

12 paperwork that co-conspirator Luis Garcia, unindicted co-conspirator

13 45 ("UICC-45"), and UICC-38 were cooperating with law enforcement;

14 Mexican Mafia Member 4 confirmed that "Cartoon" from the Canta Ranas

15 gang was now a Mexican Mafia member; and A.E. had been stripped of

16 his territories.

17

Overt Act No. 300:  On or before October 22, 2014, co-

18 conspirator Miguel Rodriguez wrote a kite at the direction of DMM-2's

19 secretary, defendant RAFAEL LEMUS, stating that defendant GABRIEL

20 ZENDEJAS-CHAVEZ had found paperwork that co-conspirator Luis Garcia,

21 UICC-38, and UICC-45 were cooperating with law enforcement, that

22 "Cartoon" from the Canta Ranas gang was now an Eme member, that A.E.

23 had been stripped of his territories, and that the accompanying drugs

24 belonged to DMM-2 and Mexican Mafia member 13.

25

26

27

28

**M.   Smuggling of Heroin and Mexican Mafia LACJ Enterprise Correspondence into LACJ**

Overt Act No. 301:  On or before October 21, 2014, co-conspirator Miguel Rodriguez directed unindicted co-conspirator Marco Meza to smuggle drugs and a kite into LACJ on behalf of DMM-2.

Overt Act No. 302:  On October 22, 2014, at the direction of co-conspirator Miguel Rodriguez, unindicted co-conspirator Marco Meza smuggled approximately 18.82 grams of heroin into LACJ on behalf of the Mexican Mafia.

Overt Act No. 303:  On October 22, 2014, unindicted co-conspirator Marco Meza possessed a kite from co-conspirator Miguel Rodriguez to defendant JOSE LANDA-RODRIGUEZ discussing Mexican Mafia LACJ Enterprise business, including the identity of potential cooperators as determined by defendant GABRIEL ZENDEJAS-CHAVEZ, the identity of a new Mexican Mafia member, and the standing of other Mexican Mafia members.

**N.   Attorney GABRIEL ZENDEJAS-CHAVEZ Passes Mexican Mafia Messages**

Overt Act No. 307:  On October 30, 2014, defendant GABRIEL ZENDEJAS-CHAVEZ visited Mexican Mafia member 11 at the ADX Florence federal prison in Colorado and showed secret messages to Mexican Mafia member 11.

**O.   Defendant RAFAEL LEMUS Assists DMM-2 in Running Mexican Mafia LACJ Enterprise Business, Including Drug Trafficking and Extortion**

Overt Act No. 323:  Beginning in or prior to February 2014, and continuing until at least May 2015, defendant RAFAEL LEMUS assisted DMM-2 in running Mexican Mafia LACJ Enterprise business.  Defendant RAFAEL LEMUS assisted in obtaining drugs from Mexico and passed

40

1   messages from DMM-2 to others including to and from defendant GABRIEL

2   ZENDEJAS-CHAVEZ.