E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SHAWN J. NELSON (Cal. Bar No. 185149)
GREGG E. MARMARO (Cal. Bar No. 338627)
DANIEL H. WEINER (Cal. Bar No. 329025)
Assistant United States Attorneys
International Narcotics, Money
 Laundering, and Racketeering Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: 213-894-5339/8500/0813
     Facsimile: 213-894-0142
     E-mail:    shawn.nelson@usdoj.gov
                gregg.marmaro@usdoj.gov
                daniel.weiner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:18-CR-00173(B)-GW-3 |
| Plaintiff, | GOVERNMENT'S CONSOLIDATED OPPOSITION TO DEFENDANT GABRIEL ZENDEJAS-CHAVEZ'S MOTIONS TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT AND EGREGIOUS BRADY VIOLATIONS [DKTS. 5072, 5111]; DECLARATION OF SHAWN J. NELSON; DECLARATION OF KEITH D. ELLISON; DECLARATION OF JOSEPH TALAMANTEZ; DECLARATION OF RENE RAMOS; AND EXHIBITS 1-23 |
| v. | |
| JOSE LANDA-RODRIGUEZ, et al., [#3-GABRIEL ZENDEJAS-CHAVEZ], | |
| Defendant. | |
| | Hearing Date: August 29, 2024 |
| | Hearing Time: 8:00 a.m. |
| | Location: Courtroom of the Honorable George Wu |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Shawn J. Nelson,

Gregg E. Marmaro, and Daniel H. Weiner, hereby files its Consolidated Opposition to Defendant Gabriel Zendejas-Chavez's Motions to Dismiss the Indictment for Outrageous Government Conduct and Egregious Brady Violations (Dkts. 5072, 5111).

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 16, 2024          Respectfully submitted,

                                E. MARTIN ESTRADA
                                United States Attorney

                                MACK E. JENKINS
                                Assistant United States Attorney
                                Chief, Criminal Division


                                 /s/
                                _____
                                SHAWN J. NELSON
                                GREGG E. MARMARO
                                DANIEL H. WEINER
                                Assistant United States Attorneys

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

1

## TABLE OF CONTENTS

2

DESCRIPTION                                                              PAGE

3

4  TABLE OF AUTHORITIES.............................................iii

5  MEMORANDUM OF POINTS AND AUTHORITIES..............................1

6  I.   INTRODUCTION AND SUMMARY OF ARGUMENT.........................1

7  II.  FACTS AND PROCEDURAL HISTORY................................3

8       A.  The Indictment.........................................3

9       B.  The 2022 Trial.........................................3

10          1.  The Government's Case..............................4

11          2.  The Defense Theory and Case.......................13

12          3.  Hung Jury and Mistrial............................15

13      C.  Discovery Prior to and During Defendant's Trial.........15

14          1.  Disclosures Apart from CDCR Information............15

15          2.  Disclosures from CDCR Files.......................16

16          3.  The Government Acknowledges That Its Disclosures
                Prior to and During Defendant's First Trial Were
17              Inadequate........................................25

18      D.  Post-Trial Disclosures................................26

19          1.  Disclosures Apart from CDCR.......................26

20          2.  Disclosures from CDCR Files.......................26

21      E.  Second Superseding Indictment.........................36

22  III. ARGUMENT...................................................36

23      A.  There is No Basis to Dismiss Under the Court's
            Inherent Supervisory Powers...........................36
24
            1.  Any Brady Violations, Standing Alone, Are Not
25              Sufficient to Dismiss an Indictment...............38

26          2.  The Government Did Not Engage in Flagrant
                Misconduct........................................39
27
            3.  Defendant Was Not Substantially Prejudiced.........44
28

## <u>TABLE OF CONTENTS (CONTINUED)</u>

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

       4.   Lesser Remedies Are Available.......................59

  B.   There Is No Basis to Dismiss for Outrageous Government Conduct................................................60

IV. CONCLUSION................................................62

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                          <u>PAGE</u>

Cases

<u>Bell v. Wolfish</u>,
   441 U.S. 520 (1979) ............................................. 17

<u>Farmer v. Brennan</u>,
   511 U.S. 825, (1994) ........................................... 17

<u>Griffin v. Gomez</u>,
   741 F.3d 10 (9th Cir. 2014) ................................ 17, 18

<u>Kyles v. Whitley</u>,
   514 U.S. 419 (1995) ............................................ 38

<u>Oregon v. Kennedy</u>,
   456 U.S. 667 (1982) ............................................ 61

<u>Strickler v. Greene</u>,
   527 U.S. 263 (1999) ............................................ 38

<u>United States v. Bagley</u>,
   473 U.S. 667 (1985) ............................................ 44

<u>United States v. Black</u>,
   733 F.3d 294 (9th Cir. 2013) .................................. 60

<u>United States v. Boshell</u>,
   952 F.2d 1101 (9th Cir. 1991) ........................ 45, 51, 52

<u>United States v. Boyd</u>,
   55 F.3d 239 (7th Cir. 1995) ................................... 52

<u>United States v. Bundy</u>,
   968 F.3d 1019 (9th Cir. 2020) ............................ passim

<u>United States v. Chapman</u>,
   524 F.3d 1073 (9th Cir. 2008) ............................ passim

<u>United States v. Cloud</u>,
   102 F.4th 968 (9th Cir. 2024) ............................ 44, 59

<u>United States v. Dominguez</u>,
   641 F. App'x 738 (9th Cir. 2016) ......................... 39, 61

<u>United States v. Garrison</u>,
   888 F.3d 1057 (9th Cir. 2018) ............................ 59, 60

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                              PAGE

United States v. Hagege,
  437 F.3d 943 (9th Cir. 2006) ..................................... 61

United States v. Kearns,
  5 F.3d 1251 (9th Cir. 1993) .......................... 37, 39, 60, 61

United States v. King,
  200 F.3d 1207 (9th Cir. 1999) ................................... 37

United States v. Kohring,
  637 F.3d 895 (9th Cir. 2011) ........................... 39, 40, 61

United States v. Morrison,
  449 U.S. 361 (1981) ............................................ 60

United States v. Price,
  566 F.3d 900 (9th Cir. 2009) ................................... 25

United States v. Rogers,
  751 F.2d 1074 (9th Cir. 1985) ................................... 37

United States v. Russell,
  411 U.S. 423 (1973) ....................................... 60, 61

United States v. Toilolo,
  666 F. App'x 618 (9th Cir. 2016) ........................... 44, 61

United States v. Tucker,
  8 F.3d 673 (9th Cir. 1993) ..................................... 37

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

3       Defendant Gabriel Zendejas-Chavez seeks dismissal of the

4   indictment based on alleged <u>Brady</u> violations stemming from the

5   government's belated disclosure of materials from the files of the

6   California Department of Correction and Rehabilitation ("CDCR").

7       The government fully acknowledges that, despite its efforts to

8   comply with its discovery obligations with respect to the CDCR files

9   prior to defendant's first trial, it fell short in its timely

10  acquisition and review of the CDCR files, such that it missed

11  documents that should have been produced prior to defendant's first

12  trial.  However, the relevant documents have now been produced, with

13  ample time for defendant to use the documents at his retrial.  The

14  question now before the Court is whether the government's actions

15  have been so egregious as to merit the extraordinary remedy of

16  dismissal of the indictment with prejudice.  The answer is no.

17      First, not every belated disclosure of potentially favorable

18  information constitutes a <u>Brady</u> violation, <u>i.e.</u>, withholding of

19  <u>material</u> favorable information.  Materiality is lacking here.

20      Second, even when a <u>Brady</u> violation occurs, "the appropriate

21  remedy will usually be a new trial," which defendant is set to

22  receive.  <u>United States v. Chapman</u>, 524 F.3d 1073, 1086 (9th Cir.

23  2008).  There is nothing inadequate about this typical remedy here.

24      Third, this Court may dismiss an indictment for government

25  misconduct for one of two reasons: (1) under its supervisory powers,

26  if the government engaged in "flagrant misbehavior" and defendant

27  suffered "substantial prejudice," or (2) on due process grounds if

28  the government's conduct was "so grossly shocking and outrageous as

1    to violate the universal sense of justice." United States v. Bundy,

2    968 F.3d 1019, 1030 (9th Cir. 2020). Defendant has fallen far short

3    of satisfying the applicable standard under either theory.

4        With respect to supervisory power, the government made multiple

5    efforts to obtain the pertinent files from CDCR, spent many hours

6    reviewing the CDCR files before the trial, and made substantial

7    disclosures to defendant prior to and during his first trial.

8    Following the mistrial, prosecutors spent many additional hours

9    combing through these files in preparation for the retrial, and the

10   government has provided relevant discovery. The government's errors

11   here were neither deliberate nor intended to hide favorable

12   information or obtain any unfair advantage at trial.

13       Nor has defendant demonstrated substantial prejudice.

14   Defendant's contention that he would have been acquitted at his first

15   trial had the information at issue been disclosed at that time is

16   speculative and unsupported by the record. The government presented

17   substantial evidence of defendant's participation in the racketeering

18   enterprise, including defendant's own words on multiple audio

19   recordings; exhibits, including gang messages, referring to defendant

20   by name; visitation records corroborating documentary exhibits and

21   witness testimony; and defendant's own actions at penal institutions.

22   This evidence, viewed in its entirety, demonstrated that defendant

23   abused his position as an attorney to facilitate communication for

24   the charged enterprise. The belated disclosures do not individually

25   or collectively materially undermine the heart of the government's

26   case.

27       Dismissal under the court's supervisory power is also improper

28   because a lesser remedy is available. Here, in addition to the usual

2

remedy of a new trial, there are other available remedies, including exclusion of certain evidence and/or jury instructions.

Finally, defendant cannot meet the extremely high standard for dismissal for outrageous government conduct.  Dismissing an indictment for outrageous government conduct is limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice.  Any due process Brady violation here falls far short of that level.

**II.    FACTS AND PROCEDURAL HISTORY**

    **A.    The Indictment**

In May 2018, the indictment charging 70 defendants with a variety of racketeering, drug, and violent offenses was unsealed. The indictment detailed the Mexican Mafia Los Angeles County Jail Enterprise's control of criminal activities in LACJ and other locations.  As to defendant, the indictment alleged that he participated in the Enterprise by using his position as an attorney to pass messages, thereby facilitating communication, for Mexican Mafia (also known as "Eme") member defendant Jose Landa-Rodriguez, deceased Eme member P.B.,[1] and other Eme members and associates, especially those in prisons and jails in California.  (Dkt. 1 at ¶ 9(b)(iii).)

    **B.    The 2022 Trial**

Defendant sought severance from his co-defendants and went to trial by himself.  Trial was originally set for July 19, 2022, but

---

[1] P.B. is the initialed-moniker of the individual referenced throughout in the indictment as "DMM-2."

1    this Court continued that trial date on its own motion to August 2,

2    2022.  The trial was conducted over sixteen days.

3            1.   The Government's Case

4        The government called 20 witnesses, including five cooperating

5    witnesses.  The government also introduced hundreds of exhibits,

6    including: a 45-minute audio-recorded meeting between defendant and

7    cooperating witness ("CW") CW-1 at LACJ, during which they discussed

8    a range of Enterprise business and concealed their communications

9    from law enforcement (such as by writing down names and locations,

10   pointing, and using hand gestures); a jail call between defendant and

11   Eme member Landa-Rodriguez, during which they discussed, in coded

12   language, that a high-ranking associate dropped out of the

13   Enterprise; a summary chart showing defendant's visits with Eme

14   members and associates at penal institutions spanning several years;

15   letters defendant wrote to, and received from, Eme members and

16   associates containing coded gang messages; and dozens of written gang

17   messages ("kites" and notes), some of which referenced defendant by

18   name (e.g., the "lawyer Gabriel").  The evidence of defendant passing

19   messages for the Enterprise was extensive, consisting in large

20   measure of the following events.

21            a.   *Defendant Attempts to Smuggle a Kite into Pelican*
                    *Bay State Prison*

22

23       A correctional officer from Pelican Bay State Prison testified

24   that in February 2014, defendant tried to smuggle a kite into Pelican

25   Bay.  (RT 417-418.)  When confronted, defendant first pretended to

26   put the kite in a locker but instead appeared to put it back in his

27   pocket, and then when confronted again, defendant shredded the kite

28   and discarded it in the trash.  (RT 425-426.)  Visitation records

                                    4

1  showed that over the next two days, defendant had attorney visits

2  with ten Eme members at Pelican Bay.  (Government's Exhibit ("GX")

3  10.2.)

4              b.   *During Meetings, Including During a Recorded*

5                   *Meeting with CW-1, Defendant Discusses Enterprise*
                    *Business*

6       CW-1 testified about a series of meetings he had with defendant

7  at LACJ between January and April 2014.  At the time, CW-1 was the

8  highest-ranking facilitator in the Enterprise and worked directly

9  under defendant Landa-Rodriguez, the Eme member who controlled LACJ.

10 CW-1 testified that defendant was his "peer" in the Enterprise,

11 though he believed that defendant "would be harder to replace."  (RT

12 645:2-7.)  He also testified that during the first meeting, defendant

13 "put up the hand that signifies the tattoo that Mexican Mafia members

14 get" -- namely, the Black Hand.  (RT 736.)

15      CW-1 testified that, in general, the purpose of those meetings

16 with defendant was to "handle issues that were going on within the

17 Mexican Mafia."  (RT 644:15-18.)  These issues included taxing the

18 Mongols motorcycle gang, new Eme members, individuals defendant

19 Landa-Rodriguez wanted to become Eme members, issues involving F.M.,

20 confirming the identities of three Surenos to be assaulted in LACJ,

21 the identities of cooperators, and the status of A.E.  (RT 756-81.)

22      As a cooperating witness, in early April 2014, CW-1 wore a

23 recording device to an in-person meeting with defendant at LACJ.  (RT

24 869; GX 71.1.)  During the meeting, defendant and CW-1 discussed a

25 range of Enterprise business, including defendant's agreement to

26 build support among Eme members for a plot to extort a rival gang

27 during his forthcoming trip to Pelican Bay.  (RT 876-877, 900.)  On

28 the recording, defendant referred to these members as "the heaviest

ones," which CW-1 testified meant the most senior members of the Eme who were at Pelican Bay. (RT 901:12-17; GX 71.1(a).) The recording contains many pauses, and CW-1 testified that during those pauses he and defendant concealed their communications from deputies by writing down names and locations, pointing, and using hand gestures.

CW-1 testified that Landa-Rodriguez wanted to confirm, through defendant, an order from outside LACJ to assault three gang members. (RT 772, 804.) Exhibits corroborated this. (GXs 76.24, 76.25.) CW-1 discussed written gang messages from Landa-Rodriguez about this topic, including that they were waiting for "Corbatas" -- defendant's moniker, which means "necktie" in Spanish -- to confirm the order. (Id.)

> ### c. During a Recorded Call, Defendant and Jose Landa-Rodriguez Discuss that CW-1, Their Highest-Ranking Facilitator, Dropped Out

The jury heard a jail call between defendant and Landa-Rodriguez in which Landa-Rodriguez relayed to defendant, in coded language, that CW-1 dropped out of the Enterprise. (RT 539-40; GX 82.1.) When defendant asked whether he should "make the appointment with him . . . or with you," Landa-Rodriguez responded, "No, just with me . . . not with him, no more." (RT 540; GX 82.1.) The government highlighted this as evidence that defendant had been using the cover of legal visits to pass messages for Landa-Rodriguez and others.

Similarly, the jury also saw a letter defendant sent to Eme member Mike Lerma, who was at Pelican Bay. In the letter, stamped "legal mail," defendant relayed in coded language that CW-1 dropped out and that Landa-Rodriguez was "not happy." (GX 82.3.)

//

//

6

### d. Defendant Passes Messages About Mexican Mafia Member A.E.

The jury heard extensive evidence regarding a plot to remove A.E. from Eme membership and to strip A.E.'s territories.  There is no question that this was in important part of the trial.  This evidence came from a variety exhibits, including written gang messages, wiretap recordings, visitation records, and witnesses, including at least three cooperating witnesses, each of whom testified that defendant passed messages in furtherance of this plot against A.E.[2]

The first cooperating witness, CW-1, testified that he and defendant discussed A.E., and that defendant "came and told me that some of the members and [P.B.] were not happy with [A.E.]" and to "relate to Fox" (Landa-Rodriguez) that these members "wanted to strip [A.E.] of membership."  (RT 781 (cleaned up).)  CW-1 testified that defendant told him that Eme members, including P.B., were not happy with A.E. because "he had made bad decisions.  He was an abusive kind of Carnal [Eme member]."  (RT 781:18-21.)  CW-1 also testified about a written message he received from Landa-Rodriguez, in which Landa-Rodriguez stated, "more than likely me and [P.B.] are going to make [A.E.] step down because he got a lot of homies hurt and a lot of bros feel the same way we feel."  (GX 76.72; RT 838:5-11.)

A second cooperating witness, CW-2, testified about a written message he received from Landa-Rodriguez, in which Landa-Rodriguez stated that he and defendant had discussed the standing of A.E.

---

[2] A fourth cooperating witness, CW-4, testified that during a visit, defendant asked about the standing of A.E. in the Mexican Mafia.  (RT 2007:20-2008:15.)

7

Specifically, the written message stated, in part, "The lawyer Gabriel pulled me out. . . . We were talking about [A.E.]. Basically [P.B.] and I and a whole bunch of brothers feel - like me a [P.B.] feel - about sitting down [A.E.] cause he had hurt a lot of good homies[.]" (GX 76.82; RT 1518:11-1519:24.)

A third cooperating witness, CW-3, testified about the plot to remove A.E. from membership and to strip his territories. CW-3 testified about a meeting held at the Zendejas Restaurant -- attended by defendant, P.B., and others -- in which the topic of A.E.'s bad standing was discussed. (RT 1776-77.) CW-3 testified that during the meeting, defendant asked if anyone had messages (meaning "Mafia messages") for Landa-Rodriguez, as defendant was set to visit him at LACJ. (RT 1777:11-19.) CW-3 also testified about a number of other interactions regarding A.E., including one in the summer of 2014 outside of defendant's law office. Though defendant was not present during this portion of the meeting, Rafael Lemus (aka "Ere", a fugitive in this case) told the group that "the lawyer," referring to defendant, was "trying to make an appointment to go to Pelican Bay to get the approval from multiple carnales (Eme members) to finally bench [A.E.]." (RT 1796:4-13.) CW-3 testified that he understood this to mean defendant would travel to Pelican Bay and pass messages to Eme members during legal visits "to strip [A.E.] from his power." (RT 1796:17-21.) CW-3 testified that Lemus told him, "the lawyer was his cousin, that is how he (Lemus) would get information from Pelican Bay and other jails." (RT 1798:24-1799:8.)

CW-3 also testified about Lemus's statements to him that Lemus wanted A.E.'s brother G.E. and associate D.C. to be killed. (RT 1808:22-23.) CW-3 never testified that G.E. was murdered. Regarding

8

D.C., when asked, "how, if at all, [did] the issues regarding [A.E.] and [G.E.] affect [D.C.]," CW-3 responded, "[D.C.] got killed in Mexico." (RT 1809:11-13.) This answer led to a sidebar, during which defense counsel moved for a mistrial, which the Court denied. (RT 1810:14-16.) After the sidebar, the Court told the jury that it was striking the answer: "At this point in time, I'm going to strike the witness's answer in regards to the situation that he last discussed." (RT 1812-10.) After another sidebar, the Court reiterated to the jury, "Just to make it clear to the jury, I have stricken the witness's answer about the murder of [D.C.] That is not part of this case at this point." (RT 1819:16-18.) Thus, there was no evidence in the record about the murders of G.E. or D.C.

CW-3 lastly testified that he wrote a kite mentioning defendant that was dictated to him by Lemus. (RT 1822-20-25.) The kite stated, in part, "well let me inform you that our lawyer discovered paperwork on [CW-1] and [M] and [L] as well[.]" (GX 89.6; RT 1824:2-3.) CW-3 testified that "our lawyer" referred to defendant, and "discovered paperwork" meant defendant found proof those individuals were cooperating. (RT 1825:8-9.) The kite also stated, "be advised that as of 9/15, all the carnales (members) came into alliance to strip down [A.E.] from all his yards and sillas (seats) as well and that their [sic] just waiting on a decision from the Committee in the Bay to finally bench him." (GX 89.6; RT 1828:24-1829:13.)

In addition to the witness testimony and written messages, two wiretap calls were admitted into evidence. (RT 1914:19-24; GXs 87.2, 87.3.) The calls, featuring Lemus and another Eme associate, demonstrated that a group of Eme members had aligned to take A.E.'s

1    territories, and that support for this "movement" came from Pelican

2    Bay and ADX.  (RT 1958:7-22; GX 87.2.)

3                    e.    *Defendant Passes Messages about Other Mexican
                           Mafia Members*

4

5        Testimony and exhibits showed that defendant passed messages

6    about other Eme members.  For example, a writing from Landa-Rodriguez

7    in which he told a co-conspirator that defendant had just visited Eme

8    members at ADX federal prison and told him the Eme business defendant

9    discussed during those visits.  Specifically, according to the

10   writing, defendant passed a message to Landa-Rodriguez that Eme

11   members at ADX did not support admitting three prospective members

12   into the Mexican Mafia: "I'm gonna share what the lawyer told us.  He

13   just got back from visiting Puppet, 18th street, ADX feds.  Basically

14   what the lawyer told us is that . . . the feds brothers are not

15   embracing or recognizing Cholo Eastside Trece, Dreamer MS-13, or

16   BamBam from Lynwood as brothers (members)."  (RT 845:3-12; GX 76.80.)

17   Visitation records showed that approximately a week before this

18   document was provided to law enforcement, defendant in fact visited

19   Eme member Francisco Martinez, aka "Puppet" from 18th Street at ADX.

20   (GX 10.2.)

21                   f.    *A Kite is Recovered in LACJ Directing that LACJ
                           Enterprise Business Be Routed to Defendant at his
22                         Law Office*

23       During the trial, an LASD deputy also authenticated a kite

24   seized from a cell at LACJ.  (RT 1916:14-1917:17.)  The kite stated,

25   in part, "Here goes an address, 2040 S. Vineyard Ave Suite A Ontario

26   CA 91761.  This is incase [sic] you need to show him some kind of

27   legal mail Gabrie [sic] Chavez his lawyer any clavo hit send it to

28   him[.]"  (RT 1919:9-14; GX 84.1.)  The address was one digit off

                                    10

(2440) from the actual address of defendant's law office.  A witness
testified that "clavo hits" means "the message that the narcotics hit
or landed" in the jail.  (RT 1940:11-12.)  The government pointed to
this document as further evidence that defendant used mail disguised
as "legal mail" to send and receive criminal communications.

> g.  *Defendant Attempts to Discard Gang Messages in a*
>     *Toilet Following Visits with Mexican Mafia*
>     *Members at ADX*

The jury also heard that in 2015, defendant visited four Eme
members at ADX, the only "supermax" prison in the federal system.
Videos showed that after those visits defendant went into and out of
the visitors' bathroom.  Prison authorities searched the bathroom and
recovered three kites from a toilet.  The kites discussed a range of
Eme business.  (RT 1252-1254; GXs 4.11, 4.13, 4.15.)

> h.  *Defendant Discusses Gang Business with a Client*
>     *and Eats a Kite at LACJ*

The jury heard from CW-4, a cooperating witness who was also
defendant's former client.  CW-4 testified that he had two in-custody
"legal" visits with defendant and the defendant spent the
overwhelming majority of those visits discussing Eme business,
including that defendant wanted to know about Eme members who were in
good or bad standing.  (RT 2008, 2012.)

CW-4 also testified to exchanging criminal communications with
defendant concealed within mail marked "legal mail."  (RT 1996:25-
1997:7.)  Specifically, CW-4 testified to receiving a "ghost note,"
concealed within legal mail, which contained the names of two Eme
members (Dom.G. and F.M.).  CW-4 testified he later came to
understand that those members were on the "green light list," the
Mexican Mafia's hit list.  (RT 2004:13-2006:12.)

11

CW-4 testified that, during his second visit with defendant, at
LACJ, CW-4 brought with him a kite from UICC-58, which he gave to
defendant.  (RT 2016:5-13.)  After defendant read the kite, CW-4 told
defendant to eat it, and defendant ate it.  (RT 2016:14-19.)  CW-4
testified that, during this second meeting with defendant, he asked
defendant to verify the two names on the ghost note; CW-4 later
clarified that it was UICC-58, specifically, who wanted this
confirmation.  (RT 2016:25-2017:13; 2053:1-7; 2054:4-20.)  CW-4
testified that defendant confirmed those were the two names on the
ghost note.  (RT 2017:4-13.)  On direct examination, the government
did not elicit the fact that Dom.G. and F.M. had both been murdered.
On cross examination, defense counsel used the timing of Dom.G.'s
murder (before CW-4's second visit with defendant) to impeach CW-4.
On re-direct, the government asked whether, at the time of CW-4's
second meeting with defendant, F.M. was still alive.  (RT 2076:6-12.)
CW-4 testified that shortly after that meeting, F.M. was murdered.
(RT 2076:11-15.)

Finally, CW-4 also testified that he was later tasked by an Eme
member with killing defendant.  (RT 2022:18-20.)  CW-4 testified that
an Eme member said defendant was "getting too big for his britches,"
meaning defendant was "thinking that he was somebody that he wasn't,"
and was "asking too many questions."  (RT 2022:21-2023:17.)  Through
all of his interactions with defendant, CW-4 believed defendant acted
like "a high-level criminal associate of the Mexican Mafia."  (RT
2023:1-17.)  CW-4 testified that he ultimately did not go through
with stabbing defendant because defendant did not show up to court on
the day he was planning to stab him.  (RT 2026.)

2.   <u>The Defense Theory and Case</u>

Defendant vigorously attacked the credibility of the
government's cooperating witnesses.  Defendant impeached the
witnesses with their prior statements, their criminal convictions,
and their motives to testify in this case, including expected/hoped
for benefits for their testimony.

As to CW-1, impeachment included his other cases and sentencing
exposure (RT 938-42, 957-59); how he came to cooperate with this
investigation (RT 942-44); other crimes he committed (RT 944-50); who
he had "green lit" (RT 952-54); and that his sister was not charged
(RT 961-62).  As to CW-2, impeachment included the terms of his plea
agreement (RT 1535-36); his prior drug use (RT 1542-44); his prior
gang activity and crimes, including taxation (RT 1546-48); and his
brief Eme membership (RT 1559-67).  As to CW-3, impeachment included
his charges and plea agreement in this case, including his sentencing
exposure (RT 1832-33); other crimes for which he hoped for leniency
(RT 1833); other crimes he may have been involved in (1834-38); his
preparation for testimony (RT 1843-44); and his prior cooperation (RT
1848-50).  As to CW-4, impeachment included his immunity letter
agreement.  (RT 2063.)

Based on trial testimony as well as discovery produced in the
course of this case, the defense also attempted to undercut these
cooperators based on apparent implausibility in light of defendant's
timeline of events.  As to CW-4, this included that one of the
persons on the ghost note had already been killed by the time of CW-
4's second meeting with defendant.  (RT 2055.)  Defendant also
attacked the investigative and prosecutorial processes, alleging that

the investigators targeted defendant because of his profession as a criminal defense lawyer and because of the clients he represented.

Defendant called six witnesses, including himself. His defense was, broadly, three-fold.

First, according to defendant, CW-1 threatened him and his daughter. While defendant stated his agreement to do illegal things for CW-1, he claimed he had no intent to follow through and never did. Even though the Court struck the testimony about the purported threat, defendant and his counsel continued to insinuate about it for the remainder of his three days of testimony, including that it informed his subsequent visits with other Eme members far beyond LACJ.

Second, defendant claimed there were legitimate reasons for his visits with Mexican Mafia members and associates, and, in particular, that his communications with Landa-Rodriguez were legitimate communications between a client and a lawyer.

Third, defendant claimed that he did not pass criminal messages. Even though Eme members would at times give information to him, he contended that he never had the intent to pass those messages to others and never did. With respect to A.E., defense counsel asked defendant: "you have been accused of participating in conversations relating to [A.E.] and sitting him down. Are any of those allegations against you true?" Defendant replied, "No." (RT 2812.) Counsel also asked defendant, "you never talked to [CW-1] about [A.E.]?" (RT 3004:10-12.) Defendant responded, "He may have brought him up, but I'm not going to get in the middle of these guys." (RT 3004:13-14.) Defendant admitted on cross-examination that Landa-Rodriguez asked him about A.E. (RT 3005:21.) When asked his

14

understanding of whether A.E. was "being sat down" in April 2014, defendant testified that he had "hear[s] negative things about people all the time.  That was it, but it was never about him being sat down."  (RT 3029:2-6.)

### 3.  Hung Jury and Mistrial

The Court declared a mistrial after the jury was unable to reach a unanimous verdict.

### C.  Discovery Prior to and During Defendant's Trial

#### 1.  Disclosures Apart from CDCR Information

Following the takedown of the case in 2018, the government began producing discovery to all defendants, consisting of an initial batch of nearly 32,000 pages of reports, transcripts, photographs, and recordings, among other materials.  (Declaration of Shawn J. Nelson ("Nelson Dec.") ¶ 3.)  Over the next three-plus years, through the beginning of 2022, the government produced an additional approximately 27,000 pages of discovery to all defendants, including information that was relevant specifically to defendant. (Id. at ¶ 4.)  The government also made a number of disclosures that were, at least initially, made only to defendant.  The disclosures consisted of a range of materials, including, as relevant here, discovery relating to cooperating witnesses, including interview reports, recordings, transcripts, criminal histories, and plea documents for the government's potential cooperating witnesses at trial, including CW-1, CW-2, CW-3, and CW-4.  (Id. ¶ 5.)

Leading up to defendant's trial in the summer of 2022, the government continued to obtain and produce trial-specific discovery to defendant.  These productions included, among other things, information relating to the murder of A.E.'s associate D.C.; a police

report and death certificate relating to the murder of A.E.'s brother G.E.; the disciplinary history for A.E.; reports of interviews with the government's cooperating witnesses; grand jury transcripts; inmate movement and housing location histories for the government's cooperating witnesses; and miscellaneous reports. (Id. ¶ 7.) By the time of the government's CDCR file review discussed next, the government had produced nearly 60,000 pages of discovery to defendant. (Id. at ¶ 8.)

       2.  Disclosures from CDCR Files

          a.  CDCR Files and Pre-Trial Review

This case was investigated by a multi-agency task force led by the FBI. (Declaration of Joseph E. Talamantez ("Talamantez Dec.") ¶¶ 2-5.) One member of the investigative team was Rene Ramos, a Special Agent ("SA") with California Department of Corrections and Rehabilitation ("CDCR"), Special Services Unit. (Id. ¶ 4.)

CDCR maintains "Central Files" for all inmates in its custody. (Declaration of Rene Ramos ("Ramos Dec.") ¶ 3.) These files include two main parts: strategic offender management system ("SOMS") and electronic records management system ("ERMS"). (Id. ¶ 4.)

SOMS can include dozens of types of records, including screening and classification documents, administrative documents, term computations, separation alerts, medical records, criminal history, detainers, warrants, housing and movement history, educational records, biographical data, sentence/release computation, and disciplinary data; these records are generally not confidential. (Id. ¶ 5.) ERMS can include alerts, case documents, fingerprints, classification documents, disciplinary documents, chronological records, parole and parole hearing records, administrative

16

segregation records, photographs, and education records.  (<u>Id.</u> ¶ 6.)
ERMS also contains a separate confidential section (the "confidential
file") that includes confidential memoranda, including interviews,
reports of investigation, safety investigations, and debriefing
reports.  (<u>Id.</u>)

The information in the confidential file is extremely sensitive.
Prison gangs are a significant threat to the safety and security of
institutional staff, inmates, and the general public.  (<u>Id.</u> ¶ 7.)
They are highly sophisticated, complex criminal organizations that
are responsible for a wide variety of criminal activity, including
murders, assaults, extortion, and drug trafficking, both inside and
outside prison grounds.  (<u>Id.</u>)  Prison gang activity by gang members
and gang associates presents one of the greatest threats to
institutional safety and security.  (<u>Id.</u>)  The confidential file also
contains documentation designated as confidential pursuant to
California Code of Regulations, Title 15, § 3321(d)(l).  (<u>Id.</u>)  It is
the policy of CDCR's Office of Correctional Safety to act with
extreme caution before turning over confidential materials.  (<u>Id.</u>)
Indeed, safeguarding institutional security is a central objective of
prison administration, and maintaining institutional safety and
security presents many challenges.  <u>See, e.g.</u>, <u>Bell v. Wolfish</u>, 441
U.S. 520 (1979); <u>Farmer v. Brennan</u>, 511 U.S. 825, 844-45, (1994); <u>see
also</u> <u>Griffin v. Gomez</u>, 741 F.3d 10, 20-22 (9th Cir. 2014) (discussing
the challenges faced by prison administrators in attempting to ensure
institutional safety and security in an environment of extreme
violence).  The disclosure of confidential information may result in
bodily injury or death to staff, other inmates, and/or individuals
outside of prison, or it may result in other breaches in security.

17

See, e.g., Griffin, 741 F.3d at 14-15 (detailing murders carried out
on the orders of an imprisoned gang leader).

Among the most sensitive documents in a confidential file are
debriefing reports.  (Ramos Dec. ¶ 8.)  Debriefing is a very
specifically controlled process by which an inmate disassociates from
a security threat group and provides information about his and
others' criminal activities, including a complete history of his
involvement in criminal activities.  (Id.)

In addition to issuing his own subpoena to CDCR (Ex. 1),
defendant requested information from the central and confidential
files of the government's witnesses and others in the first half of
2022.  (Declaration of Keith D. Ellison ("Ellison Dec.") ¶ 3; Ramos
Dec. ¶ 10-11.)  Government counsel contacted Special Agent Ramos
about reviewing the files.  (Ellison Dec. ¶ 3; Ramos Dec. ¶ 10-11.)
On more than one occasion, Special Agent Ramos consulted with CDCR's
litigation coordinator, who replied that the government could not
obtain access to the requested central files, including the
confidential portions thereof, absent a subpoena.  (Ellison Dec. ¶ 3;
Ramos Dec. ¶ 10-11.)  Furthermore, even if CDCR provided the
materials, CDCR would heavily redact them.  (Ellison Dec. ¶ 3; Ramos
Dec. ¶ 10.)  Government counsel reported this information from CDCR
to defense counsel.  (Ellison Dec. ¶ 3.)  The government did not
subpoena these records from CDCR.  (Nelson Dec. ¶ 9; Ellison Dec.
¶ 4.)  As addressed below, the government acknowledges that it should
have done so.

As trial neared, defendant renewed his request for discovery
from CDCR's files.  (Dkt. 5111 at 27-37.)  On July 24, 2022,
defendant moved to compel information from CDCR files.  (Dkt 3629.)

18

Government counsel again contacted Special Agent Ramos, and initially, counsel received the same response: that CDCR would not provide the government with the requested files absent a subpoena, and the materials would in any event be heavily redacted. (Ramos Dec. ¶ 11; Ellison Dec. ¶ 5.) On or about July 28, 2022, government counsel directly contacted a CDCR litigation coordinator, Lieutenant Manny Avalos. (Ellison Dec. ¶ 6; Ex. 2.)

On or about July 28, 2022, five days before trial was set to begin, Lieutenant Avalos informed government counsel that, after consulting with CDCR's Office of Legal Affairs, CDCR would allow government counsel to review CDCR central files, including the confidential portions thereof. (Ellison Dec. ¶ 7; Ramos Dec. ¶ 12.) However, Lieutenant Avalos informed government counsel that no information from the confidential portion could be disclosed to the defense without pre-clearance from CDCR's Office of Legal Affairs. (Ellison Dec. ¶ 7; Ramos Dec. ¶ 12.) Lieutenant Avalos informed government counsel that it could access the requested CDCR materials through SA Ramos's laptop connection to CDCR's network. (Ellison Dec. ¶ 8; Nelson Dec. ¶ 13.)

At this point, one of the trial AUSAs relinquished his remaining role in the impending trial to focus almost exclusively on the review of the CDCR files. (Nelson Dec. ¶ 13.) Defendant had requested CDCR file reviews of (1) the government's cooperating witnesses, specifically, CW-1, CW-2, CW-3, and CW-4; and (2) A.E., a Mexican Mafia member relevant to the case against defendant, as discussed previously. Regarding the cooperating witnesses, the CDCR files consisted of approximately 13,000 pages. (Id. ¶ 20.) Regarding A.E., the CDCR files consisted of approximately 40,000 pages. (Id.)

19

1    The more than 50,000 pages of CDCR files were highly
2    disorganized and not searchable. (Id. ¶ 14.) Each of the categories
3    of documents described above, apart from the confidential file, were
4    kept as separate documents under separate tabs. (Id.) The reviewing
5    AUSA had no prior experience with CDCR files, so at least initially,
6    he needed to review every type of document to see if it might contain
7    discoverable information.[3] (Id.) Each of the documents in the
8    confidential file, debrief reports, safety investigations, and
9    investigative memoranda was a separate PDF file that was not
10   searchable. (Id.) Each of the confidential documents, which could
11   range between three and upwards of 100 pages, had to be separately
12   opened and then searched manually to find references to the subject
13   inmate. (Id.) From about July 28, 2022, through about August 6,
14   2022, the reviewing AUSA worked side-by-side with SA Ramos and his
15   laptop and undertook this manual review of the CDCR files. (Id.)

16          b.   *Disclosures from 2022 CDCR File Review*

17   Of the four cooperators, only one ██████ had "debriefed" with
18   CDCR, and as detailed below, the government produced significant
19   information from that CDCR debrief. Based on the government's CDCR
20   file review in July/August 2022, the government made the following
21   disclosures to defendant before and during trial:

22   **CW-1**: The 2022 disclosure included CW-1's disciplinary history
23   and the following information from CW-1's confidential file: ██████
24   ████████████████████████████████████████████████████████████
25   ████████████████████████████████████████████████

26
27   ─────────────────────
28   [3] Once the reviewing AUSA became more familiar with the types of
     records and the information they contained, he was able to more
     quickly review the documents.

█████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

█████████████████████████ ███

██   The government also later disclosed a document related to CDCR's validation of CW-1 as an associate of the Eme that included a written statement by CW-1.  (Ex. 4.)

**CW-2**: In four disclosures in 2022, including in response to defendant's continued requests, the government disclosed CW-2's disciplinary history, his parole violation history, the fact that the debriefing process was explained to him in June 2018 but that he did not debrief because he was no longer in CDCR custody (this was around when he was brought to federal custody on this case), and defendant's written response to his validation as an associate of the Eme.  The disclosures also included additional information from CW-2's confidential file, including: █████████████████████

██████████████████████████████████████

███████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████



(Ex. 5.)

**CW-3**: The 2022 disclosure included CW-3's disciplinary history and information from his confidential file, including

. (Ex. 6.)

**CW-4**: The government disclosed a letter containing a list of CDCR disciplinary history and violations. (Ex. 7.)





15 ).

16      **A.E.:** In addition to reviewing and making disclosures from the

17 CWs' files, the government attempted to review A.E.'s confidential

18 file.[6]  As the file was almost 17,000 pages long, this was

19 essentially an impossible task to undertake.  The government

20 recognizes that the better practice would have been to disclose this

21 impossibility to the Court and counsel and seek a continuance.

22 Instead, the government attempted to conduct this review.  During the

23 review, the government found information



28      [6] Pursuant to a previous request, the government had disclosed
A.E.'s disciplinary history.  (Ex. 8.)

1 ██████████████████████████████████████████████████

2 █████████████████████████████████████████████

3 ███████████████████████████████████████████████

4 ████████████████████████████████████.  (Dkt. 5111

5 at 33.)

**Mentions of Defendant**: The government disclosed a letter setting forth instances in which the government found that defendant was mentioned in CDCR documents.  (Ex. 10.)

**Availability of Interwiewees:**  The government's disclosure letters offered to make the interviewees who made statements about the cooperating witnesses available for interview.  Defendant requested to interview two of the inmates and the government arranged for interviews of those inmates at their prisons.

> 3.   The Government Acknowledges That Its Disclosures Prior to and During Defendant's First Trial Were Inadequate

The government recognizes that its disclosures before and during trial fell short.  First, the government should have subpoenaed the CDCR files so that it could have begun conducting its review earlier. Even if defendant had also subpoenaed the records he sought, CDCR's SA Ramos was part of the prosecution team, and thus the government was obligated to disclose Brady, Giglio, Jencks, and Rule 16 information in the CDCR files.  See United States v. Price, 566 F.3d 900, 909 (9th Cir. 2009) ("Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does.") (citation omitted). Second, the government should have realized that it could not complete the necessary thorough review in the time before and during trial.  Once the government saw the volume and disorganized nature of

25

the material in CDCR's files, the government should have asked for a
continuance of the trial date in order to allow for the time
necessary to do a thorough review.  The government fully acknowledges
these shortcomings.

### D.   Post-Trial Disclosures

#### 1.   Disclosures Apart from CDCR

Over the course of 2023 and 2024, the government continued
making disclosures to defendant.  These disclosures included, as
relevant here: documents relating to UICC-58, including his visitor
log and inmate location history in LACJ; discovery relating to the
stabbings of UICC-58 and associates of A.E. in July 2014 relating to
the plot against A.E.; cooperator documents (proffer reports,
criminal histories, and location histories, among others) relating to
the government's new cooperating witnesses; reports relating to the
murders of G.E. and D.C. (A.E.'s brother and associate); reports
relating to the murder of F.M.; additional discovery regarding CW-1;
additional discovery regarding A.E.; information from the
filter/privilege review team relating to incidents of defendant at
ADX and Ventura County Jail in 2017; CDCR profiles of inmates
defendant visited; and trial and grand jury transcripts.  (Nelson
Dec. ¶ 18.)

#### 2.   Disclosures from CDCR Files

##### a.   Communications with CDCR

Because of the difficulties from the 2022 review, the government
set out to find a better way to review CDCR's files.  In March 2024
(after the SSI was returned), the government contacted CDCR's Office
of Legal Affairs directly and worked out an arrangement in which CDCR
provided the requested CDCR files (central files and confidential

1  portions thereof).  (Nelson Dec. ¶ 24.)  In April 2024, the

2  government began receiving the requested CDCR files.  (Id. ¶ 25.)

3      Some of the data the government received were organized and

4  searchable (primarily the SOMS data); other data were not, including

5  the confidential files.  (Nelson Dec. ¶ 19.)  Thus, the government

6  needed to first convert the non-searchable data, which consumed hours

7  or even days of the week using Adobe.  (Id.)  After receiving help

8  from its litigation support department, the government was able to

9  upload the documents into an electronic-review database, which made

10  the documents searchable.  (Id.)  This greatly accelerated the review

11  of the CDCR files.  (Id.)

12      The 2024 review so far has consisted in total of nearly 90,000

13  pages of CDCR files and took nearly three months of regular days to

14  conduct.  (Id.)  The government is still reviewing certain CDCR

15  files, specifically, those of P.B., defendant Alvino Munoz, and F.N.;

16  the government anticipates completing this review within a couple

17  weeks.  (Id.)

18          *b.   Disclosures from 2024 CDCR File Review*

19      Through the government's 2024 review, the government has found

20  and disclosed to the defense additional relevant information beyond

21  what it found and disclosed to defendant in its 2022 CDCR file

22  review.  The most significant piece of new information in the 2024

23  disclosure was a March 2018 "Case by Case Review" of CW-2 that

24  defendant incorrectly refers to as a debrief; as further described

25  below, this was a safety report evaluating CW-2's suitability for

26  housing in a two-man cell, not a full debriefing report.  The

27  government also disclosed limited additional information gleaned from

28  ██████ debrief that it concedes it missed in its 2022 file review.

The government further produced a debrief of another inmate included in A.E.'s confidential file; ███████████████████████

████████████████████████████████████████████████████████████

█████████████████████████

Specifically, the government has disclosed the following:

**CW-2**: The government produced a letter with attachments setting forth information on CW-2. (Ex. 12.)  The government's 2024 disclosure repeated the 2022 information discussed at page 21, but also included new information.  (Compare Ex. 5 and Ex. 12.)

As indicated above, the most significant new disclosure was a March 2018 "Case By Case Review" report examining whether CW-2 would be safe being housed with other Southern California Hispanic gang members. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████     ██████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████

The government also produced ████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████

**CW-4**: The government produced a letter with attachments setting forth information on CW-4. (Ex. 13.)  The 2022 disclosure consisted

28

of CW-4's disciplinary history and 

---

7 Unlike in 2022, when the government could not obtain
permission from CDCR to disclose the actual documents, in 2024 the
government was able to obtain the documents in a redacted format so
that it could disclose the actual documents to the defense.
29



Finally, the 2024 disclosure contained mentions of CW-4 contained in the debriefs, interviews, or investigations of other inmates.

**A.E.**: The government's 2024 production related to A.E. was extensive.  (Ex. 14.)



The attachments also provide significant consistent information. The attachments are primarily reports of investigation into the safety of A.E.  Specifically:



_____

[9] Defendant's requested information back to January 2013.  (Dkt. 3629 p.6.)

31

1  ██████████████████████████████████████████ ███

2  ██████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████  ████████████████████████

5  ████████████████████████████████

6  ██████████████████████████████  ██████████

7  ████████████████████████████████████████████

8  ████████████████████  ████████████████████████████

9  ██████████████████████████████████████████

10 ██████████████████████████████████  ████████████

11 ████████████████████████████████████████████

12 ████████████████  ████████████████████████████

13 ████████████████████████████████.

14      **G.E.:** The government also reviewed G.E.'s CDCR files.  It found

15 and disclosed ████████████████████████████████

16 ████████████████████████████████████████████████

17 ███████████████████████.  (Ex. 15.)  ████████████████████

18 ████████████████████  ████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████  ██████████████████████████

21 ████████████████████████████████████████████████

22 ████████  ██████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████.

25

26

27 ─────────────────────
   [10] ████████████████████████████████████████████████

28 ████████████

**CW-1**: The government produced a letter with attachments setting forth information on CW-1 (Ex. 16.)

The 2024 disclosure repeated the validation document and the four items discussed on pages 20-21, all of which came from the confidential portion of CW-1's CDCR file.  The 2024 disclosure contained the following additional information from CW-1's confidential file: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .

Further, the 2024 disclosure repeated CW-1's CDCR disciplinary history but added his LASD/LACJ disciplinary history.

**CW-3**: The government produced a letter with attachments setting forth information on CW-3.  (Ex. 17.)  The 2024 disclosure repeated the information from the 2022 disclosure discussed at page 22. Significant new information in the government's 2024 disclosure ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████ ████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████ . These interviews were not debriefs.

**New Witness CW-12**: The government produced a letter and exhibits for CW-12, who did not testify in the first trial but will be called

as a witness in the forthcoming trial.  (Ex. 19.)  The letter includes CW-12's disciplinary history, as well as ███████████████ ███████████████████████████████████████ ███████████████████████████ ████████████ ████████████████████████ █████████████████████ ████████████████████████████████ ████████████████████████████ █████████████████████████████."

**New Witness CW-13**: The government produced a letter with two exhibits for CW-13, who did not testify in the first trial but will be called as a witness in the forthcoming trial.  (Ex. 18.)  That letter sets forth CW-13's disciplinary history and ██████████ ███████████████████████████████████████████████████ ████████.  █████████████████████████████ ████████████████████████████ ██████████████ █████████████████ ████████████████████ █████████████████ ███████████████████████████████████████████████ ███████████████████████ ███████████████ ███████████████████████ ████████████████████████████████████████ ██████████████████████████ ████████.

**New Cooperating Defendants**:  The government also disclosed letters and attachments relating to two cooperating defendants charged in this case, CW-10 and CW-11, who did not testify at the first trial but will be called as witnesses in the forthcoming trial. The disclosure for CW-10 includes his disciplinary history, significant mentions of him in the debriefs of others, and █████████

1    ███████████████    ████████████████████████████████

2    ████████████████████████    The letter for CW-11 sets forth

3    mentions of him in debriefs and interviews of other inmates.

4        **F.M.:** The government produced a letter with information from the

5    CDCR files of F.M.  (Ex. 20.)  The government alleges that F.M. was

6    an Eme member who was killed for failing to participate in the murder

7    of Dom.G.  The letter referred to the separately-disclosed debriefs

8    of ████████████████████ and set forth other mentions of F.M. in

9    debriefs and interviews of other inmates.

10        **F.N.:** The government produced a letter and exhibits from the

11    CDCR files of F.N.  (Ex. 21.)  The government alleges that F.N. had

12    UICC-58 stabbed on the orders of A.E.  The letter sets forth F.N.'s

13    enemies and other information regarding F.N. and refers to the

14    debriefs and similar documents for UICC-58 and CW-13.  The attachments

15    include a report of the stabbing of F.N.

16        **UICC-58:**  The government produced a letter disclosing

17    information from CDCR files of UICC-58.  (Ex. 22.)  The government

18    alleges that UICC-58 killed F.M.  The letter refers to the otherwise

19    disclosed debriefs of ████████████████████ and sets forth

20    statements from other debriefs and interviews that discuss UICC-58,

21    especially as he fits into this case.

22        **Defendant Landa-Rodriguez:** The government produced a letter and

23    exhibits from the CDCR files of defendant Landa-Rodriguez.  (Ex. 23.)

24    This information included Landa-Rodriguez's enemies/separates, his

25    validations, extended passages from a co-defendant's 2023 debrief and

26    initial debrief, summaries of dozens of mentions of Landa-Rodriguez

27    in debriefs, interviews, and reports, including extended passages.

28

**Mentions of Defendant**: The government produced a letter setting forth passages from CDCR files in which defendant was mentioned. (Ex. 11.)   This was assembled from the USAO's own search and a search by CDCR.  (Nelson Dec. ¶ 21(a).)

### E.   Second Superseding Indictment

In February 2024, a federal grand jury returned a Second Superseding Indictment ("SSI") against the six remaining defendants in this case, including defendant Chavez.  (Dkt. 4808.)  As relevant here, the SSI made limited changes to the general allegations, manner and means, and overt acts.[11]  These changes were based solely on three sources: (1) trial testimony from defendant's first trial; (2) new cooperators who in 2023 (that is, after the trial) provided new details relevant to the plot against A.E. and to the murder of F.M., as well as reports corroborating the cooperators' proffers; and (3) information from the filter/privilege review team.  (Id. ¶ 24.) Defendant alleges that the government "used th[e] information" from the 2024 CDCR file review to "craft a new superseding indictment" (Dkt. 5072 at 3.)   That is incorrect: the government's 2024 CDCR file review commenced after the SSI was returned.  (Id. ¶¶ 24-25.)  Not a single new allegation in the SSI is based on any information discovered in the 2024 CDCR file review. (Id.)

## III. ARGUMENT

### A.   There is No Basis to Dismiss Under the Court's Inherent Supervisory Powers

"If the government's investigatory or prosecutorial conduct is reprehensible, but not quite a violation of due process, the district

---

[11] Defendant moved to strike the new allegations in the SSI. (Dkt. 4842.)  The Court denied the motion.  (Dkt. 4895.)

court may nonetheless dismiss an indictment under its supervisory powers." United States v. King, 200 F.3d 1207, 1214 (9th Cir. 1999) However, "these supervisory powers . . . are more often referred to than invoked," id. (cleaned up), and the circumstances under which the Court may exercise its supervisory power are "substantially limited," United States v. Tucker, 8 F.3d 673, 674 (9th Cir. 1993) (en banc). A district court may dismiss an indictment under its inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." United States v. Bundy, 968 F.3d 1019, 1030 (9th Cir. 2020) (cleaned up).

The "drastic step" of "dismissing an indictment is a disfavored remedy," United States v. Rogers, 751 F.2d 1074, 1076 (9th Cir. 1985), and implicates separation-of-powers principles, Chapman, 524 F.3d at 1085 (explaining that improper dismissal of indictment with prejudice "encroaches on the prosecutor's charging authority"). Accordingly, the Ninth Circuit has held that "[u]nder its supervisory powers, a district court may dismiss an indictment with prejudice for prosecutorial misconduct only if there is '(1) flagrant misbehavior and (2) substantial prejudice,'" Bundy, 968 F.3d at 1031 (quoting United States v. Kearns, 5 F.3d 1251, 1253 (9th Cir. 1993)), and there is "no lesser remedial action" available, id. Defendant fails to establish any of those elements.

1                  1.   <u>Any Brady Violations, Standing Alone, Are Not</u>
                     <u>Sufficient to Dismiss an Indictment</u>

2

3      Defendant asks the Court to dismiss the indictment based on

4 alleged <u>Brady</u> violations.  Although the government agrees that

5 certain belatedly disclosed evidence should have been produced prior

6 to defendant's first trial, not every failure to timely disclose

7 amounts to a constitutional violation.[12]  "[T]he term '<u>Brady</u>

8 violation' is sometimes used to refer to any breach of the broad

9 obligation to disclose exculpatory evidence -- that is, to any

10 suppression of so-called '<u>Brady</u> material' -- although, strictly

11 speaking, there is never a real '<u>Brady</u> violation' unless the

12 nondisclosure was so serious that there is a reasonable probability

13 that the suppressed evidence would have produced a different

14 verdict."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281 (1999).  "There are

15 three components of a true <u>Brady</u> violation: The evidence at issue

16 must be favorable to the accused, either because it is exculpatory,

17 or because it is impeaching; that evidence must have been suppressed

18 by the State, either willfully or inadvertently; and prejudice must

19 have ensued."  <u>Id.</u> at 281-82.

20      Defendant cannot satisfy the prejudice (materiality) prong.  For

21 the same reasons discussed <u>infra</u> in subsection 3 with respect to

22 substantial prejudice, defendant has not shown a reasonable

23

24      [12] The government does not dispute that CDCR was part of the
prosecution team for <u>Brady</u> purposes, and that the prosecutors had a
25 duty to learn of favorable evidence in the cooperators' CDCR files.
<u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) ("[T]he individual
26 prosecutor has a duty to learn of any favorable evidence known to the
others acting on the government's behalf in the case, including the
27 police.").  But the government does not concede that it violated
<u>Brady</u>.
28

probability that the late-disclosed evidence would have produced a different outcome, namely an acquittal rather than a hung jury. Put differently, defendant has not shown a reasonable probability that every juror would have acquitted defendant based on the late-disclosed information. That is because the new evidence does not undermine the substantial evidence that was presented at trial demonstrating that defendant participated in the Enterprise, including defendant's own words and the independent documentary evidence proving defendant's guilt of the charged conspiracies.

Even if there was a true Brady violation, however, the Ninth Circuit has made clear that such a violation (indeed, even multiple Brady violations) does not warrant dismissal of an indictment absent flagrant misconduct in withholding the evidence, substantial prejudice, and the absence of a lesser available remedy. Bundy, 968 F.3d at 1031, 1037. Those prerequisites are absent here.

2.    The Government Did Not Engage in Flagrant Misconduct

Negligent or grossly negligent government conduct is not "flagrant"; dismissal is permitted only for intentional misconduct or reckless disregard for the prosecutor's constitutional obligations. Chapman, 524 F.3d at 1085; Kearns, 5 F.3d at 1255; United States v. Dominguez, 641 F. App'x 738, 740 (9th Cir. 2016) (affirming finding of no "flagrant" misconduct although government conceded that it was "sloppy, inexcusably tardy, and almost grossly negligent" and had committed numerous Brady, Giglio, Jencks Act and Rule 16 violations).

United States v. Kohring, 637 F.3d 895 (9th Cir. 2011), is instructive. The defendant in Kohring, a state representative, was convicted of public corruption offenses for accepting cash and other benefits in exchange for acts benefitting an oil field services

39

company.  Id. at 898.  The government's case consisted primarily of the testimony of two company executives (Allen and Smith) and recorded conversations between these two cooperators and defendant Kohring.  Id. at 899.  After trial, the government, for the first time, produced several thousand pages of documents, including reports and handwritten notes from interviews with Allen and Smith.  Id. at 900.  The Ninth Circuit held that the newly-disclosed information was material under Brady.  Id. at 912.  Although the government disclosed extensive documents after trial, and only after the defense filed a Brady motion, the Ninth Circuit nonetheless found that the government had not "acted flagrantly, willfully, and in bad faith," and refused to exercise its supervisory authority to dismiss the indictment.  Id. at 912-13 (quoting Chapman, 524 F.3d at 1085).  In doing so, the court noted that the government had taken corrective action, including by producing the voluminous records that were the subject of the appeal.  Id. at 913 n.5.  Thus, "the proper course [was] to place the case, once again, in the hands of a jury, fully apprised of all the relevant information."  Id.

The same is true here.  The government did not intentionally or recklessly ignore its responsibilities to turn over favorable material information to the defense.  The government fully acknowledges that it failed to use all of the tools at its disposal -- such as its subpoena power -- to obtain the records with sufficient time to conduct an exhaustive review.  The government also acknowledges that it failed to appreciate that, despite the numerous hours spent reviewing CDCR files before trial, it did not have enough time to review the files as thoroughly as required.  But those shortcomings were at most negligent, not flagrant, willful, or bad

faith conduct.  Moreover, as in Kohring, the government has taken

corrective action.  The government has now conducted a more thorough

review and produced voluminous records from CDCR files far in advance

of the retrial date, and defendant will be able to make full use of

the new materials at his retrial.

Defendant's reliance on Bundy is misplaced because the facts

there were far more egregious.  The Bundy defendants were charged

with obstructing law enforcement officials carrying out an order to

impound Bundy's cattle for failure to pay federal grazing fees, and a

central pillar of the government's case was that the defendants

recruited armed followers to thwart the operation by intentionally

deceiving them into believing that the Bundys were in danger because

government snipers surrounded their ranch.  968 F.3d at 1023-25.

Despite defendants' pretrial discovery request for evidence of

the presence of snipers, "[t]he prosecution withheld facially

exculpatory evidence that directly negated the government's theory

that the defendants lied about fearing snipers," including documents

that were in the prosecution's possession all along.  Id. at 1025,

1041-42.  After producing "dribs and drabs" of discovery on this

issue during trial, id. at 1028, the government tried to absolve

itself of responsibility for its untimely disclosures by arguing that

many of the documents were in the possession of the FBI rather than

the U.S. Attorney's Office, hiding behind the district court's

discovery order, claiming that documents were not relevant or

exculpatory, and blaming the defendants for not requesting more

specific information.  Id. at 1027, 1029, 1037-39, 1044.  In

upholding the district court's finding of willful misconduct, the

Ninth Circuit further noted that the government had (1) opposed one

41

1  of the defendants' valid discovery requests as a "fantastical fishing

2  expedition" rather than trying to respond, (2) falsely assured the

3  district court that there were no snipers at the previous trial of

4  co-defendants (which had led the district court to preclude certain

5  defense evidence), and (3) represented "that things did not exist"

6  but "ultimately [they] were found to exist." Id. at 1038-42.

7      Chapman, like Bundy, involved glaring misconduct.  There, the

8  AUSA repeatedly represented that all discovery pertaining to various

9  witnesses had been turned over, even though the AUSA had no idea what

10  he had produced because he failed to keep a log.  524 F.3d at 1078-

11  79.  In the trial's third week, the prosecutor produced 650 pages of

12  discovery, including rap sheets, plea and cooperation agreements, and

13  other information related to government witnesses, including at least

14  three important witnesses who had already testified.  Id. at 1079.

15  In affirming the district court's dismissal of the indictment based

16  on its finding that the AUSA acted "flagrantly, willfully, and in bad

17  faith," id. at 1080, the Ninth Circuit cited the government's failure

18  to keep records of what had been disclosed, the affirmative

19  misrepresentations to the court of full compliance, and the

20  government's unwillingness, both in the district court and on appeal,

21  to take responsibility for its actions.  id. at 1085, 1088.

22      Here, by contrast, the government did not shut its eyes to its

23  discovery obligations.  It disclosed substantial impeachment evidence

24  regarding the cooperators prior to defendant's first trial.  As set

25  forth in the attached declarations, the CDCR files at issue were not

26  in the prosecutors' possession, so the government made good-faith

27  efforts to obtain and review them and respond to defendant's

28  discovery requests prior to and during the first trial.  The

42

1  government devoted a great deal of time following the mistrial to re-

2  reviewing the files and then producing discoverable information that

3  it had previously missed.  The government has maintained detailed

4  records of its document productions, has acknowledged its errors, and

5  has not made excuses for its conduct.  Moreover, the government's

6  negligence here does not undermine judicial integrity, nor is there a

7  need to deter future illegal conduct.  See Bundy, 968 F.3d at 1030

8  (describing two of three permissible bases for exercising supervisory

9  power).

10       Defendant argues that the government made misrepresentations to

11  the Court about the status of discovery, but the two statements

12  defendant cites were either true or reflected the government's good

13  faith belief at the time.  First, with respect to the existence of

14  "debrief reports" for the cooperating witnesses, defendant asserts,

15  "The government did not disclose [CW-4]'s actual debriefing reports,

16  and it falsely claimed that none existed for the other CWs." (Dkt. No

17  5111: 5:11.)  ███████████████████████████████████████████

18  ████████████████████████    "Debrief report" has a specific meaning

19  and such reports do not exist for ███████████████    Second, the

20  government's statement that it had reviewed CW-2's file and turned

21  over everything in the file that was identified as discoverable was

22  made in the context of the search for a debrief report (which does

23  not exist) and reflected the government's best understanding at the

24  time.  That the government overlooked the March 2018 "Case By Case

25  Review" for safety purposes does not demonstrate that the government

26

27       [13] The transcript demonstrates that defendant's statement that

28  CW-2 testified that he debriefed is not accurate.  (See pages 55-56, below.)

43

1    flagrantly ignored its discovery obligations regarding CW-2 or any

2    other witness.  See United States v. Toilolo, 666 F. App'x 618, 620

3    (9th Cir. 2016) (affirming finding that government did not act

4    flagrantly despite numerous Brady and other discovery violations).

5        Defendant also complains that the government failed to disclose

6    information in A.E.'s CDCR confidential file relating to the stepping

7    down of A.E. and told defense counsel that it was discontinuing

8    review of A.E.'s file because it had not found (and did not believe

9    it would find) discoverable material.  (Dkt. 5111 at 33; Nelson Dec.

10   ¶ 14.)  While this statement was admittedly a product of the

11   government's imperfect review, it was not meant to deceive and does

12   not establish "flagrant" misconduct.

13       In sum, although the government concededly made errors, it did

14   not act flagrantly.  Accordingly, dismissal of the indictment is

15   unwarranted.

16           3.   Defendant Was Not Substantially Prejudiced

17       The court can find a Brady violation only if "there is a

18   reasonable probability that, had the evidence been disclosed to the

19   defense, the result of the proceeding would have been different."

20   United States v. Bagley, 473 U.S. 667, 682 (1985).  That standard

21   applies here, where the government's failure to disclose occurred

22   after trial.  United States v. Cloud, 102 F.4th 968, 979 (9th Cir.

23   2024).

24       Defendant's claim that the jury would have unanimously acquitted

25   rather than hung had the information at issue been timely disclosed

26   is highly speculative and not supported by the record.  There was

27   substantial evidence from multiple witnesses (cooperating and non-

28   cooperating alike) and documentary evidence that defendant was a

                                   44

participant in the charged Enterprise.  Even though the belatedly disclosed information could have provided additional fodder for cross-examination as to specific incidents or sub-plots, viewing the evidence in its entirety, there is not a reasonable probability that all jurors would have concluded that defendant did not participate in the Enterprise and voted to acquit.  Unlike in Bundy, none of the new disclosures go to the heart of defendant's defense at his first trial -- that he was threatened by a government witness, that Eme members gave him criminal information but that he only nodded along because he was afraid of them but had no intent to pass the information, or that he had legitimate legal reasons for his visits to penal institutions.[14]

Indeed, the new disclosures overwhelmingly support the government's theory of the case and corroborate the evidence the jury already saw during the first trial: a 45-minute audio-recorded meeting between defendant and CW-1 at LACJ, during which they discussed a range of Enterprise business and concealed their communications from law enforcement (such as by writing down names and locations, pointing, and using hand gestures); a jail call between defendant and Eme member Landa-Rodriguez, in which they discussed, in coded language, that a high-ranking associate dropped out of the Enterprise; a summary chart showing defendant's visits with Eme members and associates at penal institutions spanning

---

[14] Defendant raises some claims in passing.  The government responds only to those that are sufficiently developed to assess materiality and prejudice.  See United States v. Boshell, 952 F.2d 1101, 1106 (9th Cir. 1991) (focusing Brady analysis on diary where defendant contended that "[m]any of the approximately 300 documents provided during trial rise to the level of Brady materials," but only specific evidence defendant cited was the diary).

1   several years; letters defendant wrote to, and received from, Eme

2   members and associates containing coded gang messages; and dozens of

3   written gang messages, some of them referencing defendant by name.

4        Despite broad claims of "conflicts" and "inconsistencies," the

5   defense fails to identify with particularity anything that would have

6   specifically led the jury to unanimously find him not guilty.  Minor

7   inconsistencies do not automatically lead to the conclusion that the

8   cooperating witnesses were lying.  Indeed, as this Court knows and

9   will instruct the jury, a "witness may say something that is not

10   consistent with something else he said or she said," and "[p]eople

11   often forget things or make mistakes in what they remember."  Ninth

12   Circuit Model Criminal Jury Instruction No. 1.7.  The government

13   attempts to address defendant's arguments on specific disclosures

14   below.

15            *a.   Disclosures regarding the stepping down of A.E.*

16        Defendant alleges that the government created a narrative that

17   defendant actively assisted in stripping A.E. of territories and

18   plotting to kill A.E.'s brother, and that the recently produced

19   information contradicts this aspect of the government's case.  (Dkt

20   5072 at 5.)  Not so.  Defendant also claims prejudice on the ground

21   that the Second Superseding Indictment alleges an "alternative

22   theory" of defendant's involvement. (Id. 5-6.)  It does not.

23        First, during the trial, the government did establish that

24   defendant actively assisted in stripping A.E. of his territories,

25   including: trial testimony, including testimony from CW-1, CW-2, and

26   CW-3; visitation records permitting the jury to infer defendant

27   passed messages in furtherance of this plot; and exhibits, including

28   kites.  One kite read, "the lawyer Gabriel pulled me out . . . we

were talking about Turi Cuca, basically Chino Peanut Butter and I and a whole bunch of brothers feel -- like the way me and Chino feel -- about sitting down Turi cause he had hurt a lot of good homies the last few years." (GXs 76.82 76.83.) Another kite stated, "be advised that as of 9/15, all the carnales [members] came into alliance to strip down [A.E.] from all his yards and sillas [seats] as well and that their [sic] just waiting on a decision from the Committee in the Bay to finally bench him." (RT 1828:24-1829:13; GX 89.6.)[15]

Defendant alleges that portions of new disclosures "(1) do not support the timeline of events concerning the stepping down of AE that [CW-3] and others testified to; (2) show that important events that witnesses like [CW-3] attempted to tie to defendant occurred without defendant's involvement ████████████████████ ████████████████████████████████████████████ ████████████████; and (3) ████████████████████████████████ ██████████████████████████████ (Dkt. 5111 at 7.) This is not materially correct.

Without more specific citation, it is difficult to precisely respond to defendant's claims. However, as to the first point, the government assumes that defendant is referring to a passage from the debrief of ████████████████████████████████████ ████████████████████████████████████████

---

[15] The government did not, however, prove that defendant was involved in the plot to murder G.E. The government introduced testimony that P.B. and Rafael Lemus wanted G.E. killed, but there was no evidence or testimony elicited that defendant was a participant in those conversations. The government did (erroneously) state in closing that defendant conspired to murder not only A.E., but also G.E. and D.C.

1   ██████████████████████████████████████████  This, however,

2   does not contradict the government's timeline and it does not show

3   defendant is innocent of passing messages about A.E., as CW-1 and CW-

4   2 testified defendant did in April 2014, and as written messages

5   show.  This evidence actually inculpates defendant, in light of other

6   evidence that defendant traveled to Pelican Bay before ████

7   ████████████.  This "new" timeline is consistent with the kite

8   that refers to an agreement on September 15.  The █████████████

9   does not show that defendant had no involvement in passing messages

10  about A.E. —— ██████████  ████████████████████████████

11  ██████████████████████████████████████████.  So,

12  while this information should have been disclosed prior to first

13  trial, it is not so clearly exculpating as to be a material

14  violation.  It has now been disclosed, and defendant can use and

15  argue it at trial.

16      Defendant next alleges that this information came from

17  "informants who began cooperating well before first trial."  (Dkt.

18  5072 at 5.)  First, assuming that defendant is referring to witnesses

19  CW-12 and CW-13, this is not completely accurate.  Neither of these

20  witnesses was cooperating in this investigation prior to the first

21  trial.  CW-13 was twice interviewed, not cooperated, in 2015 by a

22  different investigation run by the ATF, who is not part of this

23  prosecution team.[16]  As to CW-12, he ███████████████████████████

24  ████████████████████  but to the government's knowledge, he did not

25  otherwise cooperate with any team in this district.  Rather, the

26  recent disclosures show that █████████████████████████████████

27  ──────────────────

28      [16] Now that this prosecution team is aware of this information, it has obtained and disclosed it.

1

2

3      Second, the information from these new cooperators does not

4 conflict with the government's theory.  In fact, it supports that

5 theory.

6

7

8

9                                                            This

10 is not materially exculpating evidence; quite the opposite.

11

12

13                          Defendant's non-specific allegations of

14 differences, without citation to evidentiary support, do not overcome

15 this.

16      Further, as discussed more fully below, the government did not,

17 as defendant alleges (Dkt. 5072 at 5-6), craft a Second Superseding

18 Indictment adding an alternative theory regarding defendant's

19 involvement in the stepping down of A.E. based on the conduct of new

20 cooperators.  The superseding indictment does not add an alternative

21 theory -- it adds additional details about defendant's passing

22 messages to Eme members at Pelican Bay on June 25, 2014, and what

23 happened after and resulting from defendant's actions.  It details

24 the actions that were taken by persons who acted after P.B. told them

25 that defendant had done the acts the government has always alleged

26 that he did -- passing messages during "legal" visits to penal

27 institutions.

28

1    In defendant's second motion, he adds to this allegation by
2    complaining that CW-3 testified that the stabbing of UICC-58 was
3    related to the stepping down of A.E. and the murders of G.E. and D.C.
4    (Dkt. No. 5111 6; RT 1807.)  At the time of the first trial, the
5    government had not uncovered this connection and did not understand
6    the centrality of the stabbing of UICC-58 to the larger stepping down
7    of A.E.  (Talamantez Dec. ¶ 10.)  It was only after the trial,
8    through further investigation, that the investigation learned how the
9    stabbing of UICC-58 was connected to the stepping down of A.E.

10                    b.    *Circumstances surrounding the murders of G.E. and
                            D.C.*
11

12    Defendant alleges that the "[e]vidence produced in the last few
13    months conflicts with testimony the government elicited from [CW-3]
14    regarding G.E. and D.C.'s murders, including the government's
15    timeline of events, the reasons G.E. and D.C. may have been killed,
16    and [defendant's] contact (which was none) with individuals who claim
17    to have been personally responsible for ordering assaults on people
18    working for A.E."  (Dkt. 5072 at 6.)  However, once again, defendant
19    fails to identify any report or interview with particularity, forcing
20    the government to try to guess as to the alleged "conflict" or
21    inconsistency.  Assuming it relates to the testimony of CW-3
22    regarding Rafael Lemus's statements to him, the government sought to
23    elicit testimony about statements made by co-conspirators that the
24    plot against A.E. was in motion.  The statements about wanting G.E.
25    or D.C. dead were made by P.B. and Rafael Lemus, and the government
26    never elicited any testimony that defendant was a part of any of
27    those conversations.  In any event, there was no evidence in the
28    record about the murders of G.E. or D.C.  The Court struck CW-3's

statement that D.C. was killed, and CW-3 did not testify that G.E. was killed.

Defendant relatedly alleges that the 2024 disclosures ███████ ███████████████████████████████████████████████████████ ██████████████ ████████████████ Again, without a specific example or citation, it is extremely difficult for the government to respond, but the government believes defendant is referring to two items discussed on page 32, above, specifically, ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ ██████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████. Neither of these statements would be admissible by defendant and would not likely lead to admissible evidence. Defendant cannot claim that he was prejudiced by the late disclosure of this information.

> c.  *Disclosures regarding CW-1's Access to Confidential Discovery via FBI-Supplied Computer*

Defendant alleges government misconduct in the belated disclosure regarding CW-1's "access to confidential discovery via an FBI-supplied computer." (Dkt. 5072 at 7.)

By way of background, CW-1 began cooperating before the takedown of this case. (Talamantez Dec. ¶ 11.) Following the takedown, the government had to move CW-1 to different facilities to keep him safe. (Id.) Finding safe housing for CW-1 was also complicated by COVID. (Id.) Prior to the previous trial, CW-1 was being held at a facility

---

[17] This is demonstrably false: the government has produced a death certificate and police reports showing G.E. was killed in Ontario, California.

that was not designed for pre-trial inmates.  (Id.)  It was not a standard pre-trial detention facility where equipment to view discovery is available.  Unlike at MDC and similar facilities, where co-defendants in this case were held there was nowhere for CW-1 to view the discovery.

The FBI did buy a laptop and got permission from the warden for CW-1 to have the non-protected discovery in this case.  (Id.)  Contrary to defendant's unsupported allegation regarding "confidential discovery," the laptop was loaded with the same general discovery as was provided for inmates at MDC or any other institution.  (Ellison Dec. ¶ 10.)  There was no such "confidential discovery" and no exemption from a protective order was necessary.

This too does not rise to a Brady violation.  It was not a "continuous stream of unlawful favors."  United States v. Boyd, 55 F.3d 239 (7th Cir. 1995).  First, while FBI did have to purchase and provide the laptop, it was simply enabling the access to discovery that all non-cooperating witnesses had.  The only reason this was necessary was because of the danger that CW-1 faced for cooperation. Second, defendant has not shown that CW-1 had any special access to protected (or supposedly "confidential") discovery.  Third, defendant thoroughly cross-examined CW-1 about his trial preparation and pre-trial meetings with the government.  In fact, defendant specifically asked CW-1 if he "had an opportunity to review the discovery in this case."  (RT 1066.)  The cross continued with the number of meetings with the USAO and the FBI, the hours of preparation, the reviewing of transcripts, the reviewing of kites, his review of discovery with his attorney.  (RT 1066-68, 1086.)  On this collateral matter, defendant cannot show that, had the jury heard that CW-1 had access to case

1  discovery on an FBI-provided laptop (as well as the safety reasons

2  for that access), it would have unanimously found defendant not

3  guilty.

4          d.   CI misconduct

5      Defendant next complains that the government has produced

6  letters discussing CI misconduct at various penal facilities that was

7  not produced before the first trial without further detail or

8  citation.  (Dkt. 5072 at 8.)  The CDCR disciplinary histories of the

9  witnesses was disclosed prior to the first trial.  Otherwise, the

10 government cannot effectively respond to this vague, unsupported

11 allegation.  Additionally, admission of this sort of uncharged and

12 un-convicted conduct is precisely what Federal Rule of Evidence 608

13 prohibits.  Here too, defendant cannot establish prejudice from the

14 late disclosure of this information.

15         e.   CW-4's and UICC-58's locations with LACJ

16     Defendant complains that new information about CW-4's location

17 in LACJ showing that the person to whom CW-4 passed this message,

18 UICC-58, "was not in custody so could not have passed the alleged

19 message to" kept him from cross examining CW-4 about this as he

20 "falsely stated under oath."  (Dkt. 5072 at 8.)  Defendant's

21 inference is not supported by the new disclosure.

22     First, the records show that UICC-58 was out of custody by the

23 time CW-4 met with defendant to confirm the identities of the

24 targets.  This does not contradict that UICC-58 had previously asked,

25 while he was still in custody, that CW-4 confirm the identities of

26 the targets with defendant.  In fact, housing records show that less

27 than three months before the meeting, CW-4 and UICC-58 were housed on

28 the same row, two cells apart, at LACJ.  Thus, CW-4 did not "falsely

1  state under oath," to anything.  To the contrary, he truthfully

2  testified that he and UICC-58 were a couple cells apart on the same

3  floor of LACJ.  (RT 2055-56.)  Thus, the housing records are

4  consistent with CW-4 receiving a message/question from UICC-58 while

5  they were housed together in LACJ, and then taking that

6  message/question to his next meeting with defendant.  The fact that

7  UICC-58 had been released after passing this question to CW-4, but

8  before CW-4 could take it to defendant, does not negate the evidence

9  of defendant confirming the identities of the targets during the

10  meeting.  It does not negate what CW-4 said about other messages

11  defendant passed.  At best, it would allow defendant to ask CW-4 on

12  cross, wasn't it true that UICC-58 had already been released by the

13  time CW-4 passed the message/question to defendant.

14      CW-4 and UICC-58's location information does not rise to the

15  level of impeachment or exculpatory evidence that would have allowed

16  the jury to acquit defendant, considering all of the evidence

17  otherwise presented by the government.

18                f.   *Disclosures regarding* ▮▮▮ *and his Interactions*
                       *with UICC-58*

19

20      Defendant claims that new information from the debrief of ▮▮▮

21  is materially exculpatory and its withholding was prejudicial.

22  (Dkt. 5111 at 10-12.)  To begin with, the government reviewed this

23  debrief in 2022 and summarized what it thought were relevant parts in

24  a disclosure letter to defendant.  The additional passage defendant

25  refers to should have been included in that disclosure.  The

26  government cannot state why it was omitted except that it was

27  certainly not intentional.  The government disclosed ▮▮▮▮▮

28  disciplinary history and that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1    ████████████████████████████.  Defense counsel also

2    cross-examined ████, including on the specific topic of the murder

3    and timing of Dom.G.  Though the information should have been

4    disclosed in 2022, it does not negate the central thrust of ████s

5    testimony: that defendant consistently acted as a high-ranking

6    associate of the Mexican Mafia; that the overwhelming majority of CW-

7    4's interactions with defendant (95-97%) were criminal; that

8    defendant casually brushed aside ████'s repeated efforts to change

9    the topic of conversation from criminal business to the legal case on

10   which defendant represented ████; that defendant passed criminal

11   messages during in-custody visits and through "legal" mail; and that

12   defendant's assertiveness in seeking Mafia-related information

13   (acting "too big for his britches") landed him in dangerous waters

14   with an Eme member.  While the new information would have provided

15   additional material for cross-examination, the new information does

16   not rise to the level of impeachment or exculpatory evidence that

17   would have caused the jury to unanimously acquit defendant.

18                g.    Purported "Debrief" of CW-2[18]

19        Defendant alleges that "during CW-2's testimony, he revealed

20   that he had debriefed in custody" and that the government's

21   statements to the contrary are false.  Not so.  CW-2 testified as

22   follows:

23        Q Now, so after your arrest in 2017, I think you indicated

24          on direct that you tried to -- what did you do to extricate

25   _____

26        [18] Defendant additionally states that the government falsely
     stated that no debriefs existed for CW-1, CW-2, or CW-3.  (Dkt. 5111
27   p.5.)  Defendant's statement is untrue.  Neither of those witnesses
     ever debriefed to CDCR.  He similarly complains nothing was produced
28   for another cooperating witness (Dkt 5111 at 5), but that witness did
     not testify.

                                    55

1          yourself from the Mexican Mafia and gangs while you were in

2          CDCR custody.

3          Did you step down?

4          A Yeah. Like, a week before that, before I came to the Fed

5          side -- excuse me.

6          Q When you sat down, did you have conversations with people

7          at CDCR?

8          A Yeah.

9          Q And your conversations were about your involvement with

10         the Mexican Mafia, correct?

11         A Yes.

12         Q And that is part of -- Luis called this a step-down

13         process?

14         A No, I was going to debrief.

15         Q You were going to debrief?

16         A Yes.

17         Q Did you start debriefing?

18         A No, I spoke with IGI.

19         Q Who is IGI?

20         A The Institutional Gang Specialist.

21         Q The investigator? You interviewed with him?

22         A Uh-huh.

23         Defendant alleges that the 2024 disclosures contradict this

24    testimony.  However, the 2024 disclosures do not include a debrief

25    report or even a preliminary debrief report for CW-2: that is because

26    none exists, because CW-2 never debriefed.  While there is not a

27    debrief, there is a March 5, 2018 "Case by Case Review" for CW-2.

28    This document does not contain materially contradictory information.

56

1    This report documents, for CDCR's internal records and

2  protection, the decision of whether an inmate should be on double

3  cell status -- that is, whether it would be safe for him to share a

4  cell with another Sureno.  (Ramos Dec. ¶ 18.)  This document ███████

5  ████████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ██████████████████████████████████.  Again, consistent

9  with CW-2's trial testimony, it was not a debrief.

10    As to the interview with CW-2, ████████████████████

11  ██████████████████████████.  ██████████████████████████

12  ████████████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████

14  ███████████████████████████████████████████████

15  ██████████████████████████.  ████████████████  ████

16  █████████████████████████████████  ████████████

17  █████████████████████████████████████████████████████

18  ████████████████████████████    This conduct predates the date

19  range for which defendant requested the government to review the CDCR

20  files ("All documents contained in CDCR central and confidential

21  files that reference any allegation or defendant in this case from

22  January 2013 through present[.]" (Dkt. 3629 at 6).)

23    Even if the government's report back to the Court and counsel

24  during testimony was inaccurate, the information contained in the

25  later disclosed report is not truly exculpatory.  Furthermore, the

26  non-disclosure of this was not intentional.  (Nelson Dec. ¶ 22.)  The

27  government disclosed another statement of CW-2 in 2022 -— his

28  response to being validated.  The government also disclosed other far

57

more damaging information about CW-2, such as his rule and parole

violations, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ .

         h.    *The Superseding Indictment Was Not Based on Any*
               *Belatedly Disclosed Information*

      As addressed previously, the Second Superseding Indictment was

not based on any belatedly disclosed information.  The government's

2024 CDCR file review did not commence until after that Indictment

was returned.  Thus, defendant's allegation that the government

"identified 'problem areas'" and "corrected them" by "craft[ing] a

new superseding indictment" (Dkt. 5072 at 3, Dkt. 5111 at 22) is

false.  Moreover, as the Court has previously concluded, the new

indictment does not materially alter the allegations of the original

indictment.  (Dkt. 4895.)  It merely adds more details regarding the

same agreement -- the agreement to participate in the charged

Enterprise.  In every retrial, the government always endeavors to

retool and strengthen its presentation, but defendant will face the

same allegations in the retrial as he did in the first trial: that he

conspired to participate in the charged Enterprise by abusing his

position as an attorney to facilitate communication among Eme members

and associates.

         i.    *Retrial Will Not Substantially Prejudice*
               *Defendant*

      The usual remedy for a <u>Brady</u> violation is a new trial.  <u>Chapman</u>,

524 F.3d at 1086.  Defendant had not shown that retrial will so

substantially prejudice him as to require dismissal.  Unlike in <u>Bundy</u>

and <u>Chapman</u>, this is not a situation where the government is

attempting to salvage a poorly conducted case.  <u>See</u> <u>Bundy</u>, 968 F.3d

58

1    at 1043-44; Chapman, 524 F.3d at 1087.  As discussed above, contrary

2    to defendant's claim, the Second Superseding Indictment did not

3    recast the government's theory.

4         It is true that at a retrial after a hung jury, the government

5    has the opportunity to identify and correct weaknesses in its

6    previous presentation, but so does the defendant.  Further, as

7    discussed above, there is not a reasonable probability that defendant

8    would have been unanimously acquitted had the evidence been timely

9    disclosed.  Thus, any "harm" stemming from a retrial is not the

10   result of the untimely disclosures, but arises simply from the jury's

11   ordinary inability to reach a unanimous verdict.  The usual remedy of

12   a new trial is the appropriate remedy here.

13            4.   Lesser Remedies Are Available

14        Defendant has also failed to show that there is no lesser

15   available remedy than dismissal.  Bundy, 968 F.3d at 1031, 1037.

16   Retrial will not "put the defense at a greater disadvantage than it

17   would have faced had the government produced the [alleged] Brady

18   material in the first place."  Id. at 1043 (defining "no lesser

19   remedial action is available").

20        In addition to the new trial remedy, lesser remedies could

21   include excluding certain evidence at trial, see Chapman, 524 F.3d at

22   1083; striking certain allegations from the Second Superseding

23   Indictment, see Bundy, 968 F.3d at 1044; jury instructions, United

24   States v. Garrison, 888 F.3d 1057, 1065 (9th Cir. 2018); or monetary

25   sanctions, Cloud, 102 F.4th at 971.  Because defendant takes

26   particular issue with belated disclosures regarding the murders of

27   G.E. and D.C., the Court could, in its discretion, account for the

28   government's shortcomings by excluding any evidence or testimony

about those murders at the forthcoming trial.  Both murders are
specifically alleged in the Second Superseding Indictment (Dkt. 4808,
overt acts 142, 144, 156, 157, and 160), which also alleges co-
conspirator conversations regarding those murders.  If the Court felt
it was necessary to do in this instance, it could strike the murders
of G.E. and D.C., including any testimony.  Defendant's proposal of
wholesale exclusion of witnesses (Dkt. No. 5072 at 4) is excessive
because defendant now has the material to use in cross-examination.
Garrison, 888 F.3d at 1065 (remedies for Brady violation "should be
tailored to the injury suffered from the constitutional violation and
should not unnecessarily infringe on competing interests") (quoting
United States v. Morrison, 449 U.S. 361, 364 (1981)).

Based on the extensive record before the Court, dismissal would
not be warranted.

### B.    There Is No Basis to Dismiss for Outrageous Government Conduct

"If the government fails to disclose material impeachment
evidence regarding government witnesses, then it violates Brady and
the due process clause." Kearns, 5 F.3d at 1254.  Even assuming that
occurred here (and the government submits it did not), the
government's actions do not meet the "extremely high standard"
necessary to permit dismissal for outrageous government conduct.
United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013).

"Outrageous government conduct occurs when the actions of law
enforcement officers or informants are 'so outrageous that due
process principles would absolutely bar the government from invoking
judicial processes to obtain a conviction.'"  Id. (quoting United
States v. Russell, 411 U.S. 423, 431-32 (1973)).  "Dismissing an

60

indictment for outrageous government conduct, however, is limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of justice." Id. (cleaned up).

The Ninth Circuit has refused to find that standard met, and has declined to dismiss for outrageous government conduct, in circumstances involving similar or more egregious discovery issues than those presented here. Kohring, 637 F.3d at 913; Kearns, 5 F.3d at 1253; Toilolo, 666 F. App'x at 620; Dominguez, 641 F. App'x at 740. Likewise, the government's conduct here does not rise to the level of outrageous government conduct. There is no basis for dismissal.

Defendant's reliance on cases involving the Double Jeopardy Clause is misplaced. (Dkt. 5111 at 16-18.) When the court declares a mistrial based on a defendant's motion, the Double Jeopardy Clause does not preclude retrial. Oregon v. Kennedy, 456 U.S. 667, 672-73 (1982). But there is a narrow exception where "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." Id. at 679. "Prosecutorial misconduct alone . . . 'does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.'" United States v. Hagege, 437 F.3d 943, 952 (9th Cir. 2006) (quoting Kennedy, 456 U.S. at 676). These Double Jeopardy principles are inapposite because here, the Court did not grant a defense motion for mistrial due to government misconduct; rather, the Court declared a mistrial because the jury could not reach a unanimous verdict. Therefore, this case is

61

governed by the legal standards discussed above for dismissal based on supervisory powers and outrageous government conduct, for which dismissal is inappropriate as set forth above.

**IV.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant Gabriel Zendejas-Chavez's motions to dismiss the indictment.