MEGHAN BLANCO (238171)
LAW OFFICES OF MEGHAN BLANCO
    28202 Cabot Road, Suite 300
    Laguna Niguel, California 92677
    Telephone: (949) 296-9869
    Facsimile: (949) 606-8988
    E-mail:    mblanco@meghanblanco.com

Attorney for GABRIEL ZENDEJAS-CHAVEZ

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>            v.<br><br>GABRIEL ZENDEJAS-CHAVEZ,<br><br>       Defendant. | No. CR 18-CR-173-GW<br><br>DEFENDANT CHAVEZ'S REPLY IN<br>SUPPORT OF MOTION TO DISMISS<br>INDICTMENT |

    Defendant Gabriel Zendejas-Chavez, by and through his counsel,
Meghan Blanco, files the attached reply in support of his motion to
dismiss.

    This reply is based on the attached memorandum of points and
authorities, the declaration of Mr. Chavez, the previously filed
motions to dismiss, and any other evidence the Court wishes to hear.

1

Respectfully Submitted,

Dated: August 20, 2024

___//s// Meghan Blanco_____
MEGHAN BLANCO
Attorney for
GABRIEL ZENDEJAS-CHAVEZ

MEMORANDUM OF POINTS AND AUTHORITIES

I.    Introduction

The government possessed 1000s of pages of exculpatory evidence prior to Mr. Chavez's 2022 trial.  Prosecutors reviewed reports that contained contradictory statements by their own trial witnesses. They reviewed reports that showed their own timeline of events regarding Mr. Chavez's alleged involvement in a conspiracy to step-down and murder GE, DC and AE was wrong, and that suggested their own star witnesses' testimony regarding those events – and by extension Mr. Chavez's involvement in those events – could not be true.  They reviewed reports that showed witness ▋▋▋▋ lied about his interactions with Mr. Chavez while in CDCR custody and while housed, temporarily, at LACJ, that implicated Mr. Chavez in two murders.[1]

Yet, before Mr. Chavez's 2022 trial, prosecutors only produced the portions of those reports that helped their case.  All the while, they lied to the Court and defense counsel about having reviewed and produced "all discoverable information" from the files. In the intervening two years, while Mr. Chavez steadfastly asserted

_____

[1] By knowingly suppressing ▋▋▋▋ 2019 Debrief Report and Mr. Hinojos's LACJ movement records, one could reasonably conclude that prosecutors knowingly suborned perjured testimony from ▋▋▋▋ at trial when they allowed him to testify about Mr. Chavez's involvement in two murders.

his right to a speedy retrial, the government opposed each of Mr. Chavez's trial demands.  And during this time, it utilized suppressed information to supersede with a new charging document that substantially changed its theory of the case.

They lied about the existence of exculpatory evidence before trial.  They lied about it during it trial.  And they are lying about the scope of their misconduct now.  Dismissal is the only remedy that can cure the intentional harm the prosecution caused to Mr. Chavez.

II.  Argument

A. The Suppressed Evidence Was Material

The government concedes, as it must, that it suppressed exculpatory evidence from Mr. Chavez prior to his 2022 trial. Shockingly, however, they argue that the exculpatory evidence that they suppressed was not material.  The facts and law do not support their conclusion.

***Stepping down of AE***

At Mr. Chavez's 2022 trial, the government argued that AE was placed on disregard status in early 2014 and that his associates, including GE and DC, were placed on the green light list as a result.  The timeline of events regarding the stepping down of AE, and plots to murder AE, GE, and DC, as explained by the government's cooperating witnesses and case agents in Mr. Chavez's 2022 trial,

began around February 2014 and was generally complete by the time Peanut Butter moved to Mexico (May 9, 2014) and an individual named Polar Bear was arrested and remanded to LACJ custody (April 15, 2014).  Evidence that the government elicited during Mr. Chavez's 2022 trial, to establish this timeline, included the following:

**The Testimony of** ██████████

During ██████████ direct examination, the government elicited damming testimony regarding Mr. Chavez's alleged involvement in "stepping down" AE between February and April 2014:

AUSA Ellison: And you have also mentioned different levels of consensus needed within EME to make decisions.  What level of consensus would you need to stripout a Mexican Mafia member like Turi and then kill him?

Answer:  It would be a group decision within the Mexican Mafia. ██████ transcripts at 783.

AUSA Ellison: What was Fox's opinion on Turi?

Answer: That he agreed with Chino and the other members.

AUSA Ellison:  You mentioned before that, you know, Mr. Chavez communicates to you that these members want Turi stripped.  You mentioned before that the consequence of that is death.

Answer: Yes

██████ transcripts at 783.

Answer:  He came and expressed to me that a decision had been made and Turi was to be stripped of his membership and his territories were to be divided among the members of the Mexican Mafia.

AUSA Ellison:  When you said he told you a decision was made to strip out Turi and step him down, who is "he"?

Answer: Chavez.

██████  transcripts at 784.

AUSA Ellison: How did you learn of Turi being stripped of his EME membership?

Answer: Through Chavez.

████████  transcripts at 750.

████████  went into protective custody May 28, 2014 and had no communication with Mr. Chavez or defendant Landa-Rodriguez after that point.  Thus, according to ████████  trial testimony, by May 28, 2014, "a group decision" had been made to strip AE of his territories and kill him.  He further claimed that Mr. Chavez told him this and that Mr. Chavez confirmed the vote during visits with EME members at Pelican Bay sometime in April 2014.

**Testimony of ████████**

████████  testified about a meeting that he attended on February 4, 2014. He claimed that issues regarding AE and GE were discussed at that meeting.  He also testified about attending two-

6

to-three additional meetings where he and others discussed stripping AE of his territories and killing his soldiers, including GE and DC. These meetings were in person and Peanut Butter (who moved to Mexico by May 9, 2014) attended two of them.  By the time Polar Bear was arrested (April 15, 2014), the group had already attempted to kill GE.  He testified that the final decision to strip AE of his yards and kill GE was tied to GE ordering the stabbing of new unindicted coconspirator-58, aka Dopey:[2]

> AUSA Marmaro: Did Turi Estrada have any brothers?
>
> Answer: Yes.
>
> AUSA Marmaro: What brothers did he have?
>
> Answer: I knew George Estrada, aka Domingo.
>
> AUSA Marmaro: Domingo Estrada?
>
> Answer: Yes.
>
> AUSA Marmaro: What role did Domingo Estrada have working for Turi?
>
> Answer: He was his little brother, also his spokesperson.
>
> AUSA Marmaro: Spokesperson on Mexican Mafia things?
>
> Answer: Yes.

---

[2] ██████████ 2022 trial testimony was the first time the government disclosed a connection between Hinojos and the stepping down of AE.  Prior to hearing ██████████ testimony, Mr. Chavez did not know Hinojos had been stabbed or that his stabbing related to issues with Turi. Mr. Chavez did not learn *when* Dopey was stabbed until the government produced CDCR reports of the stabbing in various productions between late 2023 and last week.

AUSA Marmaro: Did you know a person by the moniker of
Radio?

Answer: Yes.

AUSA Marmaro: And who's Radio?

Answer: His real name was David Cortez.

AUSA Marmaro: And what was David Cortez's or Radio's role?

Answer: He was under Turi for a long time, then he started
claiming he was a Carnal.

███████████████ Transcripts at 1762.

AUSA Marmaro : Did you then -- were you then invited to a
meeting to talk about the Estradas? (Asking about the
February 4, 2014 meeting)

Answer:  Yes, the following day.

AUSA Marmaro: And where was the meeting going to take
place?

Answer:  It was at the lawyer's office -- at the
restaurant, next to his office, I mean.

AUSA Marmaro: What is that restaurant called?

Answer:  Zendejas Bar and Grill.

███████████████ Transcripts at 1770.

AUSA Marmaro: How long did the meeting last, in total?

Answer:  Minimum of two hours, I believe.

███████████████ Transcripts at 1775.

AUSA Marmaro: Did you attend any other meetings with Mr.
Chavez at that time period?

Answer:  Yes.

8

AUSA Marmaro: Just to be clear, we're talking late winter, spring, 2014?

Answer:   Yes.

AUSA Marmaro: Where was the meeting?

Answer:   The second one was at a restaurant in Moreno Valley.

AUSA Marmaro: Who was at that meeting?

Answer:   It was Gabriel Zendejas, myself, Malo, Huero Vargas, Peanut Butter, Gerry Tapia, Ere, and some other old man called his name was Marcos, I believe.

████████      Transcripts at 1781.

AUSA Marmaro: So let's turn back to the Moreno Valley restaurant meeting. After that meeting, what, if any, conversations did you have with Peanut Butter about Turi Estrada, same time period, spring of 2014.

Answer:   The only thing he told me, try to keep the peace when you talk to [AE] again because to kick back and to tell his brother to step back. They don't want him doing nothing because he was making wrong calls and they were already getting sick of him.

AUSA Marmaro: At some point, did you switch over to Team Peanut Butter?

Answer:   Yes.

AUSA Marmaro: When was that?

Answer:   It was about a month later, around April 2014.

AUSA Marmaro: How did that come about, who invited you to start working for Peanut Butter?

Answer:   Peanut Butter invited me personally.
AUSA Marmaro: What did he say to you?

Answer:    He told me, look, we tried to work with Turi
already, we already gave him numerous warnings. He's not
listening, so we're going to strip him. We're going to
take his power.  And I like you a lot, and he says, you
are under him and you are out here, you are going to be
one of the first people we're going to come after. I
suggest you come on my team, because I don't want to get
hurt.

███████████████████    Transcripts at 1784-1785.

AUSA Marmaro: Same time period, I think you said April
2014, did you attend a meeting with Peanut Butter at the
LA Convention Center?

Answer:    Yes

███████████████████    Transcripts at 1786:

AUSA Marmaro: Did the topic of Domingo Estrada come up?

Answer:    Yes.

AUSA Marmaro: What was discussed about Domingo Estrada?

Answer:    That they were already fed up with him and
Peanut Butter wanted him dead.

AUSA Marmaro: When Peanut Butter said that, what did you
take that to mean?

Answer:    He wanted him killed.

███████████████████    Transcripts at 1787.

AUSA Marmaro: Let's go to the same time period. Did you
attend a meeting in Long Beach with a person who went by
the moniker Polar Bear?

Answer:    Yes.

AUSA Marmaro: And what was discussed at that meeting?

███████████████████    Transcripts at 1787.

Answer:   Malo said he went to the lawyer's office he talked to Ere and that they told him they were pushing the issue that they wanted.[3]

██████████████████ Transcripts at 1788.

AUSA Marmaro: ████████████, what was your understanding of what happened at that meeting?

Answer:   That they wanted Domingo dead.

██████████████████ Transcripts at 1788.

AUSA Marmaro: When Ere was telling you about Domingo Estrada, you guys were talking about it everyday, what kinds of things was Ere telling you about Domingo Estrada?

Answer:   Well, what had happened at the time, some people that were under Peanut Butter, one of them was Dopey and some other dude named Chato, they were in the Calipatria Prison. They had got assaulted on Domingo's orders. And then the fact that Turi didn't authorize it. These people got stabbed, and that's when they said they finally had enough of Turi and Domingo. No more talking.

AUSA Marmaro: What, if anything, did Ere say about whether Domingo Estrada -- whether followed through on that green light?

Answer:   His main thing he wanted Domingo dead, he wanted to do it personally.

██████████████████ Transcripts at 1807-8.

At this point in the testimony, Mr. Chavez asked for several sidebars, as the government was connecting Mr. Chavez to murders about which prosecutors had produced almost no discovery despite numerous requests:

---

[3] ████████████ later claimed that Malo asked Polar Bear to murder GE at this meeting.  Polar Bear returned to custody on April 15, 2014 and remained incarcerated continually through GE's murder.

11

COURT: The problem is this, apparently you are saying that everything that happens – every murder that happens somehow is connected with what Mr. Chavez says and does. You don't have any evidence of that.

MR. ELLISON: I disagree. I'm not saying every murder that happens, what we're saying here is that defendant played a vital role in communicating whether this order to take care of Turi Estrada and his associates happened, and that it was…

███████████████ Transcripts at 1814.

THE COURT: Let me stop. Where is the evidence that Chavez was somehow connected with the transportation of that particular evidence insofar as vis-à-vis the murder?

MR. ELLISON: So what is consistent with other witness's testimony in this case, Your Honor, is that when you are talking to somebody like Domingo, somebody like Radio, who are Turi Estrada's right-hand men, it's part and parcel of speaking to them. So when he goes to Pelican Bay to talk about stripping Turi of his membership, this witness has already said they assaulted all – everybody under Turi. That's why he had to go work for Peanut Butter because he was working for Turi. If he would have continued to work for Turi, he would be assaulted.

COURT:    How did he play the role in that?

MR. ELLISON: All of the things I just said. The visitation records corroborating when he went to Pelican Bay. He met with Mexican Mafia members, the kite that talks about him going to talk about Turi Estrada and the testimony of multiple witnesses.

MR. MARMARO: Including ███████████ and the (April 2014) kite saying, we were talking about Turi Cuca.

███████████████ Transcripts at 1816.

**The Testimony of Special Agent Talamantez**

In sworn testimony before two grand juries, and during Mr. Chavez's 2022 trial, FBI Special Agent Joseph Talamantez corroborated the timeline of events described by Mr. Rodriguez and Mr. Garcia.

*2016 GJ Testimony*:



*2021 GJ Testimony*:

In 2021, SA Talamantez confirmed the same timeline when the government superseded against Mr. Chavez, the first time, in 2016:



---

4 The two came to the meeting together. Initial reports do not mention issues with AE or GE being discussed at the meeting.

At Mr. Chavez's 2022 Trial, SA Talamantez endorsed this timeline of events yet again:

> Here are people that have to drop out of the gang or go into protective custody for a number of reasons. One, you kind of -- you heard ███████████ testify that he was working on the team of Turi Estrada, and Turi Estrada came into bad standing. That, by extension, means that everybody that was working for Turi Estrada is now in bad standing. They are not cooperating with law enforcement. They are not providing information, there is no paperwork on them, but now they haves safety concerns so they have to go into protective custody or drop out. It is not by their own choice.

***Suppressed Evidence***

The evidence that the government suppressed, prior to Mr. Chavez's 2022 trial, demonstrably reflects that the government's theory at Mr. Chavez's 2022 trial was wrong. For instance, ███ suppressed CDCR file contains countless references to the violence that erupted across CDCR facilities in ***September 2014*** as a result of EME members voting, at that time, to ████████████████████████ ███████████████████████████████████████. The suppressed evidence contradicts the timeline of events that █████████ and Talemantez testified to during Mr. Chavez's 2022 trial (tying Mr. Chavez to assisting EME members in their efforts to kill AE, GE, and DC between February and May 2014).

A CDCR report, generated in September 2014, references an order to stab and assault all of ████████████ across CDCR facilities

14

1  after ▮▮▮▮▮▮▮▮▮▮. Over the course of three days, CDCR

2  recorded ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[5]:

3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9      Contrary to testimony elicited during Mr. Chavez's 2022 trial,

10  suppressed reports indicate that ▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮. Suppressed reports also indicate that Mr.

13  ▮▮▮▮▮▮ continued to work for ▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮.

15

16      Mr. Chavez specifically requested information relating to AE

17  for years. The government produced nothing even though it possessed

18  the information and was ordered, repeatedly, to disclose it:

19  • Prior to trial, AUSA Nelson obtained ▮▮▮▮▮▮ Central

20      and Confidential CDCR files. The files contained dozens and

21      dozens of reports about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23      ▮▮▮▮▮▮ Although AUSA Nelson reviewed these files, the

24  _____

25  [5] The report is heavily redacted and does not even include its
    distribution list. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

government falsely, and repeatedly, asserted that ███ files contained nothing discoverable.[6]  Additionally, it did not produce either M███████████████████████████████████████████ ████████████████████████████████████████████

- On April 16, 2021, the USAO charged Robert Hinojos separately in *United States v. Hinojos*, 21-CR-191-SW.  The indictment in *United States v. Hinojos* contains overt acts that occurred at Calipatria State Prison.  The prosecutors in Mr. Hinojos's case are the same ones prosecuting Mr. Chavez.  However, the prosecution filed a case information sheet in the Hinojos case that falsely indicated that Hinojos's case was unrelated to Mr. Chavez's.  That false representation resulted in Hinojos's case being assigned to a different judge, Judge Wilson.  And that enabled the government to hide and suppress Hinojos's discovery from counsel in *Landa*.   After filing a new, second superseding indictment against Chavez in March of 2024, the government publicly indicated, for the first time, that the conduct in Mr. Hinojos's indictment was *part of the same conspiracy charged here*.  Discovery originally produced in *United States v. Hinojos,* but not to Mr. Chavez (still), includes

---

[6] Mr. Nelson reviewed the files over the course of three days.  It is unclear why he stopped reviewing files the Saturday before trial.

information that the government obtained from Calipatria State Prison, as specifically charged in that indictment.

- On April 28, 2015, AUSAs from *this* US Attorney's Office and agents from *this* task force interviewed ███████ concerning, among other things, ███████████████ ███████████████████████ ███████████████████████.

The lead case agent from *United States v. Hinojos*, Michele Starkey,[8] drafted ████████ 2015 proffer report. CDCR Task Force Officer John Castaneda was also present during the proffer. SA Casteneda was CDCR TFO Rene Ramos's supervisor when Mr. Chavez was arrested. In ████████ 2015 proffer report, the government notes:

_____

[7] ████████████ proffered several times between 2015 and 2017. Prior to 2023, he never implicated Mr. Chavez in anything █████. He has never met, or spoken to, Mr. Chavez. After reading about Mr. Chavez's 2022 trial, he implicated Mr. Chavez in the █ ████.

[8] SA Starkey became upset when ███████████████████ ███████████████████████████. According to a disclosure letter produced this year, she told AUSAs that she did not believe ███ was credible. Starkey was also used to place a telephone call to ████████ in 2014 to advise him of a threat against his life by ████████. That call led █████████████████████████. The government charged his murder as part of this conspiracy, even though they have known, since at least 2022, that ████████ murder was unrelated to this case. They have not produced that exculpatory information to defense counsel still.



Inexplicably, prior to the time Mr. Chavez filed the instant
motion to dismiss on August 2, 2024, the government had only
produced 2023 and 2024 proffer reports for ███████████. The
government finally produced ███████████ 2015 and 2017 proffer
reports late last week.

In addition to the substantial prejudice that Mr. Chavez
experienced by not being provided with information he needed to
effectively cross examine the government's witnesses, who directly
implicated him in conspiracies to murder three people, the
government unfairly capitalized on this suppressed information when
it filed a Second Superseding Indictment in March 2024. The Second
Superseding Indictment used the suppressed information to materially
change the government's timeline of events with respect to AE, as
demonstrated by SA Talamantez's 2024 GJ testimony:



Talamantez GJ Testimony at 36-38.



SA Talamantez testified, for over a dozen pages, about information that was suppressed that the government has now incorporated into numerous new overt acts.  Mr. Chavez will not include all references here, as the Court is familiar with the nature of the government's new charging document from Mr. Chavez's previously litigated motion to strike.

B. Mr. Chavez will Continue to Suffer Prejudice if the Case Is Not Dismissed

Beyond the hundreds of pages of suppressed exculpatory evidence relating to AE, the government also knowingly suppressed hundreds of additional pages of exculpatory reports that contained a variety of important information including, but not limited to, prior witness statements that were incompatible with the same witness's trial testimony (e.g., ████████ 2019 debrief reports); LACJ housing records, visitation records; and uncharged misconduct that CWs who testified during Mr. Chavez's 2022 trial engaged in while cooperating against Mr. Chavez.  The government's intentional misconduct infected each witness the government used against Mr. Chavez at trial.  The prejudice was immeasurable and deprived Mr. Chavez of a fair trial.  And it continues today—the government continues to capitalize on its misconduct.

Had the government complied with its discovery obligations, Mr. Chavez would not have testified at his first trial.  Had he possessed the suppressed evidence, he would not have had to testify— he would have simply been able to meaningfully cross examine the government's witnesses.  Without access to crucial, exculpatory information in the government's possession, he lacked the information that was needed to explain critical topics, including what occurred during his LACJ meeting with ████████ (in which the government, yet again, implicated him in conspiracies to murder

other people not related to the AE murders), and all of the events concerning AE.  He cannot now retract his trial testimony.  He cannot erase its existence.  Now the government can use it against him in all future proceedings.

Further, Mr. Chavez will never regain his lost opportunity to secure an acquittal with his first jury.  The government's misconduct robbed the jury of being able to fairly evaluate evidence of his guilt or innocence.  But despite the government's gross misconduct, the jury still hung 9-3 and 6-6 in favor of acquittal.[9] Had the government complied with its constitutional and statutory discovery obligations, it is likely that all jurors would have voted to acquit.

The government's misconduct did not stop with its suppression of evidence.  The government has now utilized the suppressed evidence to materially change its theory in a Second Superseding Indictment that it filed after the statute of limitations expired.  For much of this period, Mr. Chavez remained on home confinement as he fought, unsuccessfully, to exercise his right to a speedy retrial.  The government opposed each of Mr. Chavez's requests to sever and to proceed to trial.  We now know why.

---

[9] The foreperson indicated that after the first vote, the jury was 9-3 in favor of acquittal on all counts.

But the government's misconduct did not stop there, either. The government continued to suppress the bulk of exculpatory evidence in its possession until July 31, 2024 – two days before Mr. Chavez's motion deadline.  He had **two days** to review around 1000 pages of heavily redacted, exculpatory reports and file the pending motion.  Two days.

Incredibly, the misconduct continued subsequent thereto.  Even after it made its Brady dump on July 31, 2024, the government continued to suppress proffer reports that revealed that ████ ████ interviewed with this US Attorney's Office, this task force, and agents who worked on this case back in 2015.  Those reports were just produced a few days ago.

This is exactly the type of gross misconduct that warrants a dismissal.  No other remedy would be appropriate.

A court may dismiss an indictment under its supervisory powers when the defendant suffers "substantial prejudice" and where "no lesser remedial action is available".  *United States v. Jacobs*, 855 F.2d 652 (9th Cir.1988).  Here, the government has acknowledged that it suppressed exculpatory evidence, but has proposed a lesser remedy than dismissal: a retrial with certain discovery sanctions.  The government's proposed remedy is woefully inadequate, would advantage the government for its misconduct, and should be disallowed.

23

In *United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004), the Court stated: "Where the defendant asks the district court to use its supervisory powers to dismiss an indictment for outrageous government conduct, the proper prejudice inquiry is whether the government's conduct "had at least some impact on the verdict and thus redounded to the defendant's prejudice." This case easily meets that standard of prejudice. This case was a pure credibility contest between the government's cooperating witnesses and Mr. Chavez. The exculpatory evidence that the government willfully suppressed would have impeached their witnesses' testimony. Without the benefit of the exculpatory evidence, the jury voted in favor of acquittal, 9-3. Had the government not suppressed the exculpatory evidence, an acquittal would have been likely. Regardless, the suppressed evidence had "at least some impact on the verdict."

The prejudice resulting from the government's willful suppression of evidence is of a sufficiently serious degree to warrant dismissal of the indictment. A retrial, as suggested by the government, would substantially prejudice Mr. Chavez for a multitude of reasons. First, to conduct a new trial at this stage would be futile because Mr. Chavez's ability to use the newly-disclosed exculpatory evidence, in light of the governments SSI, would be meaningless. *United States v. Fitzgerald*, 615 F. Supp. 2d 1156

24

(S.D. Cal 2009).  Second, the inordinate passage of time, between the alleged misconduct and now, would result in insurmountable prejudice.  Witnesses are now dead (e.g., ███████████ ██████ credited with killing PB and order hits attributed to Mr. Chavez), memories have faded, new witnesses cannot be located, investigatory leads are more difficult, and certain evidence no longer exists.  *See Doggett v. United States*, 505 U.S. 647 (1992) (noting in the context of a speedy trial claim that "the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence" is "the most serious" type of prejudice "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.").  As a result, Mr. Chavez has forever lost his opportunity to adequately defend against the charges.

Third, Mr. Chavez would be prejudiced because a retrial would allow the government to revise its case strategy, as evidenced by the SSI.  *See People v. Chapman*, 524 F.3d 1073 (9th Cir. 2008) (noting mistrial remedy would advantage the government by giving it a "chance to try out its case, identify any problem areas, and then correct those problems in a retrial.")